**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MARSELLUS VAULT & SALES, INC., Respondent.**

**No. 930, Docket 33076.**

United States Court of Appeals, Second Circuit.

Argued May 14, 1969.

Ordered Submitted to Court in Banc Dec. 2, 1969.

Returned to Panel April 8, 1970.

Decided Sept. 3, 1970.

Morton Namrow, Frank H. Itkin, Attys., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Norton J. Come, Asst. Gen. Counsel, N.L.R.B., for petitioner.

Robert W. Kopp, Lyle W. Hornbeck, William L. Bergan, Joseph H. Ballway, Jr., Bond, Schoeneck & King, Syracuse, N.Y., for respondent.

Before WATERMAN, SMITH and KAUFMAN, Circuit Judges.

WATERMAN, Circuit Judge:

This is a petition by the National Labor Relations Board to enforce its order of March 29, 1968, against respondent Marsellus Vault & Sales, Inc. The Board, agreeing with its Trial Examiner, found that the Company violated Section 8(a) (1) of the National Labor Relations Act by coercively interrogating employees about their union activities; by threatening to close the plant if the Union came in; by inducing employees to withdraw their support of and membership in the Union; and by urging employees to form their own union rather than joining a local of the Teamsters. The Board also adopted the Examiner's finding that the Company violated Section 8(a) (5) and (1) of the Act by refusing to bargain with the Union after it had been designated as the bargaining agent of the Company's employees in an appropriate unit.

The Board's order requires the Company to cease and desist from engaging in the unfair labor practices so found, and from interfering with employee rights in any like or related manner; to bargain with the Union upon request; and to post appropriate notices.

The respondent timely answered the Board's petition and seeks to have the Board's order vacated and set aside.

The case was argued to the present panel of the court on May 14, 1969, and thereafter has had a history unlike that of any other case in the Second Circuit.

The panel filed an opinion on October 1, 1969. Two judges granted enforcement of the Board's order in its entirety. One judge dissented in that opinion to the enforcement of the portion of the order that required the respondent to bargain with the Union.

The respondent requested that the full court consider the case in banc and on December 2, 1969 this request was granted. The Board then moved to have the case remanded to it for further consideration at the administrative level. This motion was denied, brief dates were fixed, and the case submitted to all nine judges. Pertinent exhibits not presented to the panel by the Board were requested and furnished by it to the in banc court. After receipt of these exhibits and examination thereof the in banc court decided, on April 8, 1970, that the earlier in banc order should be revoked and a panel opinion filed enforcing the Board's order in full. Pursuant thereto a unanimous panel files the within opinion.

Respondent is engaged in the manufacture and sale of funeral supplies. Its principal place of business is in Syracuse, New York, but the present dispute concerns its small plant in Mexico, New York. During the period in question, March 26, 1967 through April 13, 1967, there were seven employees in the Mexico plant. One of these, William Roberts, acted as the plant manager, a position he had held for several years prior to this time. His immediate supervisor was respondent's personnel director, Richard Perschel, whose office was in Syracuse but who normally visited Mexico twice each week.

On March 27, 1967, a meeting was held in a neighborhood tavern between all the Mexico employees, excluding Roberts, and James Parry, vice president of the Dairy and Bakery Salesmen and Dairy Employees Union, Local 316, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter the Union). At this meeting, Parry distributed "Application for Membership" cards in the un-

ion. The purpose and meaning of the cards were carefully explained to the employees and all six signed cards, signing them on each of two signature lines set forth thereon. The signed cards had been, of course, exhibits at the hearing the Board's Trial Examiner had conducted. However, they were not made available to the court by the Board until the court requested them after the judges had decided to consider the case in banc. A supposed facsimile of an unsigned card was incorporated into the Trial Examiner's written decision and the interpretation of the language of this presumed accurate facsimile by the original panel had brought about the petition requesting in banc treatment. The original cards disclose that they are divisible into two parts by tearing along a perforated line just above the legend "Check-Off Authorization And Assignment" and just below the signature line to the upper portion of the card headed by the legend "Application For Membership." The facsimile originally presented to the panel disclosed that there were two signature lines but did not disclose the existence of the perforation or the fact that the card could be separated into two independent parts by tearing along the perforation, which, when done, would result in two fully executed signed documents. See Appendix to this opinion.

By signing the upper half of the card the signer designated the Union as the signer's collective bargaining representative. By signing the lower half of the card the signer authorized his employer to deduct union dues each month from the signer's wages. However, just above the signature line on the lower half of the card is a two sentence paragraph reading:

"I have read the above authorization and application and understand it and have signed it of my own free will. This is not to be applicable until 30 days after the date hereof."

The six cards were received March 29 at the Regional Office of the Board in

Buffalo, N.Y., accompanying the Union's petition for certification.

On March 28 the Union's president, Patrick F. Shanahan, sent a letter to John Marsellus, respondent's president, stating that the Union had possession of signed authorization cards from all the employees in the Mexico plant, and that an inspection of the cards could be arranged. Marsellus was also requested to begin bargaining with the Union immediately. On April 3, a reply was sent to the Union stating that the Company was in favor of having the representation question settled by a Board election. No mention of a card check was made.

In the intervening period, Perschel had visited Mexico and had stated to Tony DeMarko, a senior employee, in the presence of co-workers, "How come you went for outside help?" He also said to Lester Wood, another employee, "* * * if you had any problems, why didn't you come to me with them?" At the same time that he made this latter remark, Perschel told Wood he wanted his and DeMarko's keys back since they were given to the employees by Roberts; and if anything happened "because of the union deal," Roberts would be responsible. A half hour later he himself reissued the returned keys to DeMarko and Wood.

On April 5 both Perschel and Marsellus visited Mexico. They told all employees that Roberts was retiring for health reasons and that Tony DeMarko was to be the "new boss," though Roberts was to stay on until April 14 to assist DeMarko in his new duties.

Later that same day DeMarko had a conversation with several employees. Exactly what he said and how he said it was in dispute before the Trial Examiner. Two employees, testifying for the General Counsel, stated that DeMarko quoted Marsellus as having said that he would close the plant before a union got in and that if the employees stuck behind him, DeMarko, they "would go places." DeMarko and another employee stated that the first remark was made in a friendly, non-threatening manner

during one of many conversations the employees had about the Union; and that it came in response to a remark that the employees should demand $2.25 per hour and was not said in response to anything said by anybody about the Union. In addition to these remarks, it is undisputed that DeMarko was trying to convince the other employees to withdraw their applications to the Union at this time in order to save the price of the union dues, $6.00 per month. Indeed, on April 6, he posted on the plant bulletin board a withdrawal letter drawn up by his wife the night before and he urged several of the employees to sign the letter in order to save money. Eventually, all of the employees did sign up to withdraw their applications except DeMarko, and the undated withdrawal letter signed by all five of the employees was mailed to Patrick Shanahan in an envelope postmarked at Mexico on April 10, 1967.

In rebuttal to the above, DeMarko testified that prior to April 5 he had taken part in discussions about withdrawal from the Union and that he favored doing so prior to his promotion. Two other employees stated that they, too, had favored withdrawal prior to April 5 and that the question was a topic of conversation in the plant throughout this period.

On April 12, the Union met with Marsellus to arrange for a consent election. The meeting was unsuccessful, however, and on the following day the instant unfair labor practice charges were filed.

*The § 8(a) (1) Violations*

■ The first alleged § 8(a) (1) violations are Perschel's remarks to several of the employees and the request for the plant keys of two of them even though the keys were later returned. The Board characterized these actions as unlawful interrogations. We cannot agree, inasmuch as we find them to be lawful under the standards set by us for judging whether interrogations are unlawful. Bourne v. NLRB, 332 F.2d 47 (2 Cir. 1964) (per curiam). We note that these

questions were more rhetorical than informational—Perschel did not wait for a reply; and they were asked at the employees' work stations, not in the office of the management representative. Much more formal interrogations seeking the type of information requested by a literal reading of Perschel's remarks were held not to violate the Act in this court's recent decision in Schwarzenbach-Huber Co. v. NLRB, 408 F.2d 236 (1969).

We do feel, nevertheless, that Perschel's remarks clearly expressed company displeasure with the employees and some measure of hostility toward the Union. Furthermore, the incident involving the keys could easily have been interpreted to express a new employer attitude of reduced trust and increased strictness toward the employees. Thus, these remarks, while not in themselves an illegal interference with the employees' § 7 rights, do add significance to the later unfair labor practices which must be viewed in this context.

■■  The principal alleged § 8(a) (1) violations involve the actions of DeMarko from April 5 onward. A threshold question here is whether in fact DeMarko was a management representative at this time. This point was vigorously contested before the Trial Examiner. The respondent contended that Roberts was still the plant manager until April 14 and that DeMarko was just "learning the ropes." The General Counsel on the other hand tried to show that DeMarko was the "boss" as of April 5 and that Roberts remained just to assist him. There were significant indicators brought out by both sides. Nevertheless, the Board's conclusion must be upheld if supported by substantial evidence taken on the record as a whole, Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and that standard is clearly met here.

The General Counsel's chief witness on this matter was Roberts himself who testified that he drove a truck during most of this period, work he did not normally do prior to April 5; that De-Marko performed the supervisory tasks of filling out drivers' orders and filing the plant's weekly report for the week of April 9–13; and that he, Roberts, just "was there to assist [DeMarko] if he had any questions." Several other employees also testified to seeing DeMarko perform supervisory tasks during this period though he did punch the time clock until April 7. Adding this testimony to the undisputed evidence that Marsellus announced on April 5 that Tony De-Marko was the "new boss" and that Roberts was staying on until April 14, we find that substantial evidence supports the Board's conclusions that De-Marko was a management representative at the time he committed the alleged unfair labor practice.

■■  We also hold that there is substantial evidence in the record taken as a whole to support the Board's findings that DeMarko violated § 8(a) (1) by threatening that the plant would close if the Union came in, e. g., Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 274 n. 20, 85 S. Ct. 994, 13 L.Ed.2d 827 (1965); NLRB v. Milco, Inc., 388 F.2d 133, 136–137 (2 Cir. 1968); by promising benefits if the employees "stuck with him," e. g., Edward Fields, Inc. v. NLRB, 325 F.2d 754, 760 (2 Cir. 1963); and by persuading them to withdraw from the Teamsters Local so as to form a union of their own, e. g., Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 683–684, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); Irving Air Chute Co. v. NLRB, 350 F.2d 176, 179–180 (2 Cir. 1965). Admittedly, the testimony of employees Schenck and Burnham on these matters was disputed by DeMarko and employees Wood and Skilinskis; but the credibility of a witness is in general a determination to be made by the Trial Examiner and the Board, and there is no overriding evaluation of all the testimony to warrant us in disregarding their conclusions in this case. We especially note the testimony of Schenck to the effect that he felt his job would be in jeopardy if he did not sign the withdrawal letter.

*The § 8(a) (5) Violation*

In addition to the § 8(a) (1) violations outlined above, the Board found that the respondent violated § 8(a) (5) of the Act by refusing in bad faith to bargain collectively with the Union when the Union represented a majority of the employees as shown by the authorization cards. Union representations that by card count a majority of employees are union members and employer representations that employers in good faith doubted the existence of the claimed union majorities are not new to this court. The result we have reached in each case has, of course, depended upon the circumstances of each case. *E. g.*, compare Schwarzenbach-Huber Co. v. NLRB, *supra*, with Irving Air Chute Co. v. NLRB, *supra*.

■■ Here there is substantial evidence to support the Board's finding that the Union represented a majority of the employees on March 27, 1967, the date the "Application for Membership" cards were signed, and that Marsellus, in violation of § 8(a) (5) refused in bad faith to recognize and to bargain collectively with the Union when requested to do so by letter on March 28, 1967.

The Company refers to the last sentence of the "Check-off Authorization and Assignment" signed contemporaneously with the "Application for Membership" as demonstrating that neither document was to become effective for 30 days, and, therefore, on the date a "demand" to bargain collectively was made the Union did not represent the employees. However, the sentence referred to which reads, "This is not to be applicable until 30 days after the date hereof," relates to the "Check-off Authorization and Assignment," a separately signed and detachable instrument from the "Application for Membership." Moreover, the latter instrument begins with the declaration, "I, the undersigned member of Local No. 316 * * * ." Therefore, it is reasonable to assume that the employees reading and signing these instruments understood that they had designated Local 316 as their bargaining representative effective immediately, but that their membership dues would not begin to be deducted from their wages "each and every month" until the expiration of the first month they worked after becoming members of the union.

In light of the fact that the alleged ambiguity in the language of the instruments signed by the Marsellus employees was not raised as an issue with the Union, or raised before the Trial Examiner or the Board, there is very little doubt of the Employer's lack of good faith in refusing to recognize and bargain with the Union. Marsellus made no effort to comply with the Union's offer to submit to a card-check or to resolve any doubts that the employees had properly designated the Union as their representative. Instead, the Company reacted to the Union's overture to bargain with a series of unfair labor practices. The fact that the Employer pressured its employees to sign a document purportedly withdrawing their previously-executed membership cards is a tacit recognition that the Company regarded its employees as belonging to the Union. We, therefore, have little difficulty in agreeing with the Board that Marsellus's refusal to bargain collectively was not a product of a good faith doubt of majority status.

■ Under the circumstances of this case the Company was under a duty to bargain collectively with the Union, for the Union had shown "convincing evidence of majority support," NLRB v. Gissel Packing Co., 395 U.S. 575, 596–597, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), and therefore the Board did not exceed its authority by ordering the Company to bargain with the Union. Such an order is now held to be an appropriate remedy for a § 8(a) (5) refusal to bargain when it is evident that the Union has lost its majority status in the wake of employer unfair labor practices. *Id.* at 610–613, 89 S.Ct. 1918, 23 L.Ed.2d 547.

The Board's order is enforced in full.

## APPENDIX
## Employee Boutell's "card" is reproduced in order to show the perforation.

DAIRY AND BAKERY SALESMEN AND DAIRY EMPLOYEES
UNION LOCAL 316
International Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of America
SYRACUSE, N. Y.

## APPLICATION FOR MEMBERSHIP

Date Employed. *SEPT. 20, 1966*

Last Name. *BOUTELL*    First Name *WALTER* Init. *E.*

Date of Birth *MARCH 2, 1941*

Address *P.O. BOX 315 MEXICO, N.Y.*

Phone No. *963-3039*

Amount Paid on Application $

Soc. Sec. No. *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*

Date Initiated  Beneficiary *MARIEL (WIFE)*

I hereby designate the Dairy and Bakery Salesmen and Dairy Employees Union Local 316, through its authorized agents, as my representative for collective bargaining.

Plant *MARSELLUS VAULTS* Dept. *MANUFACTURING*
Voucher *AND SALES, INC.*
*MARCH 27, 1967*  Signed *Walter E Boutell*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## CHECK-OFF AUTHORIZATION AND ASSIGNMENT

I, the undersigned member of Local No. 316 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, herewith, authorize my employer to deduct from my wages each and every month my union dues, consisting of initiation fees, fines, and uniform assessments owing to such Local Union as a result of membership therein, and direct that such amounts so deducted be sent to the Secretary-Treasurer of such Local Union for and on my behalf.

This authorization and assignment shall be irrevocable for the term of the applicable contract between the Union and the Company, or for one year, whichever is the lesser, and shall automatically renew itself for successive yearly or applicable contract periods thereafter, whichever is the lesser, unless I give written notice to the Company and the Union at least 60 days and not more than 75 days before any periodic renewal date of this authorization and assignment of my desire to revoke the same.

I have read the above authorization and application and understand it and have signed it of my own free will. This is not to be applicable until 30 days after the date hereof.

Employee *Walter E. Boutell*

Date *MARCH 27* 19*67*

Witness: *J. James Parry, VICE PRES*

[A 2604]