**Daniel A. DONOVAN et al.,
Petitioners,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**Nos. 552, 1343, Dockets 73–2642,
73–2823.**

United States Court of Appeals,
Second Circuit.

Argued May 16, 1975

Decided July 25, 1975.

Certiorari Denied Jan. 12, 1976.
See 96 S.Ct. 783.

Patrick L. Vaccaro, Jackson, Lewis, Schnitzler & Krupman, New York City (David Kreitzman, Joseph F. Legnard, New York City, of counsel), for petitioners.

Jay E. Shanklin, Atty., Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Assoc. Gen. Counsel, Elliot Moore, Deputy Assoc. Gen. Counsel, NLRB, Washington, D. C., for respondent.

Before SMITH and OAKES, Circuit Judges, and JAMESON,* District Judge.

OAKES, Circuit Judge:

This case presents the question whether a union's coercive conduct can preclude it from the benefits of a *Gissel* bargaining order (*NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)) made as a result of an employer's § 8(a)(1) and § 8(a)(3) conduct (notes 1 and 2 *infra*). The petitioners in this case, Daniel Donovan, Charles Brennick and John Brennick, are co-partners doing business under the trade name "Daniel A. Donovan d/b/a New Fairview Hall Convalescent Home" (the

Company). The Company, a licensed proprietary nursing home and extended care facility located in New Haven, Connecticut, appeals from a decision of the National Labor Relations Board which found (1) that the Company violated § 8(a)(1)[1] of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1), by certain coercive action intended to undermine employee attempts to organize and (2) that the Company violated §§ 8(a)(3)[2] and (1) of the Act, 29 U.S.C. § 158(a)(3) and (1) with respect to the reinstatement of strikers. The Board issued an order requiring the Company to cease its unfair labor practices and to make whole for any loss of wages the employees discriminated against. In addition, the Board found that the Union had at all relevant times valid authorization cards from a majority of the Company's employees in an appropriate bargaining unit and that the Company's refusal to bargain with the Union constituted a violation of § 8(a)(5)[3] and (1) of the Act, 29 U.S.C. § 158(a)(5), justifying under the circumstances the issuance of an order requiring the Company to bargain with the Union without an election. *See generally NLRB v. Gissel Packing Co., supra.*[4]

Petitioners' principal contention is that in spite of any misconduct by the Company, the Union's organizational activities were marked by such extensive violence, coercion and intimidation that the issuance of a bargaining order was an inappropriate remedy. Under petitioners' view, the Board has allowed a bargaining order in favor of a union which chose to bypass the peaceful processes of the Act and to resort to illegal and dis-

---

* Of the District of Montana, sitting by designation.

1. Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), provides that:

    (a) It shall be an unfair labor practice for an employer—
    (1) to interfere with, restrain, or coerce employees in the exercise of [organizational rights].

2. Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), prohibits discrimination in hiring or firing on the basis of union membership and also prohibits any "term or condition of employment to encourage or discourage membership in any labor organization."

3. Section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5), makes it an unfair labor practice for a company to refuse to bargain collectively with the representative of the employees.

4. Petitioners are before this court pursuant to Section 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f). The Board has cross-applied for enforcement of its order.

ruptive activity to further its organizational aims. The argument is that issuing a bargaining order encourages future union violence. The administrative law judge who heard the case concluded with the Company that the Union's misconduct was so substantial that the remedial powers of the Board should not have been exercised through the issuance of a bargaining order. The Board, however, declined to adopt the law judge's recommendation.

We turn to the facts surrounding the Union's attempts to organize the Company, upon which the case turns. The Union held its first organizational meeting in February, 1971, with only six employees present. By March 1, however, the Union had obtained authorization cards from 39 of the 58 Company service and maintenance employees. At that time, the Union asked the Company to recognize it as a bargaining agent and offered to submit its card majority to verification by a neutral party. The Company gave no immediate response. On March 2, the Union mailed 30 authorization cards to the NLRB office in Boston and filed for an election. On March 11, after another request by the Union for recog-

nition, the Company stated that it doubted the validity of the authorization cards and that it would await the results of an election before recognizing the Union as a bargaining agent.

Between mid-February and May 6, 1971, however, the Company engaged in a concerted effort to undermine the Union's organizational activities. The Company threatened employees concerning the loss of their jobs if they continued to support the Union,[5] solicited employees to negotiate grievances directly with the Company rather than through the Union,[6] coercively interrogated employees[7] and in at least one instance withheld a raise[8] to a Union supporter.[9]

The trial judge's summary of the Company's pervasive misconduct between February and May 6 covers some 30 pages of an extensive opinion and demonstrates a complete disregard on the part of the Company for the protected rights of its employees. The Company's activities, in short, followed a clearcut pattern of coercion and intimidation not limited to isolated events. In this court, the Company has, in effect, abandoned

---

**5.** A Company shift supervisor, Lane, often questioned the employees about the Union, cf. *Retired Persons Pharmacy v. NLRB,* 519 F.2d 486 (2d Cir. 1975), slip op. 4599, 4608–11, and on several occasions threatened employees that they were "taking a chance" with their jobs because of their union affiliation. He made repeated suggestions to Union organizers that the Company could "find reasons" to fire everyone connected with the Union, and on at least one occasion indicated that the Company had a spy in the Union ranks who would help to arrange the firings. Such threats are clearly unfair labor practices. *See NLRB v. Hendel Mfg. Co.,* 483 F.2d 350 (2d Cir. 1973); *NLRB v. Gladding Keystone Corp.,* 435 F.2d 129, 132–33 (2d Cir. 1970).

**6.** On March 5, 1971, the Company's administrator, Shepherd, assembled the employees and charged that the Union was made up of a "bunch of racketeers," and that the employees should come to management first if they had problems, and that if a union was important to them, management could get them a union. Shift supervisor Lane also suggested to the employees that they should go directly to management with their grievances. Another man-

agement representative, Greenwood, also made suggestions that the employees bypass the Union in favor of management. Such conduct interfered with the employees' Section 7 rights. *See NLRB v. Marsellus Vault & Sales, Inc.,* 431 F.2d 933, 937 (2d Cir. 1970).

**7.** The record shows repeated instances where the administrator, Shepherd, food service manager, Distasio, and director of nurses, Boecker, questioned employees about their union affiliation, asked them to provide information to the Company concerning the Union's organizational efforts and in general expressed hostility toward membership in the Union. *See NLRB v. Marsellus Vault & Sales, Inc., supra* n.6.

**8.** Food service manager Distasio told one of his employees that he "wouldn't get a pay raise as long as this union stuff was going on." *See NLRB v. Gladding Keystone Co., supra* n.5.

**9.** There were also a number of minor § 8(a)(1) violations by Company representatives, most of which involved threats of the loss of benefits (coffee breaks, lunch periods, etc.) if the Union were allowed into the Company's facility.

any effort to contest the findings of the trial judge and the Board [10] as they relate to the Company's misconduct. Rather, the Company relies wholly upon the Union's own misconduct as precluding the issuance of a bargaining order.

■ On May 4, 1971, the Company suspended employee Louise Tierney, a union activist, for circulating a leaflet falsely stating that the brother of petitioner Donovan had attempted to bribe her to cease her union activity.[11] Thereafter, on May 6, the Union began a strike in her support which lasted until September 8.[12] At least 51 unit employees did not perform work or services for the Company during the strike. While the strike ended in September, the Company's coercive activity continued against those who had supported the Union. As found by the law judge, the Company had jobs for at least 18 strikers when the strike ended, but engaged in a purposeful pattern of discrimination by refusing to reinstate the 18 either immediately or when vacancies arose and in one case by refusing to reinstate a striker to her former job. *See generally NLRB v. Fleetwood Trailers Co.,* 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); *NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938).

■ The Company further undermined the Union's strength when three months after the strike it awarded for the first time Christmas bonuses which amounted to between $3 and $15 depending on length of service to the unit employees. Petitioner Donovan could offer no credible explanation for the sudden Christmas bonus leading the trial judge to conclude that the bonus was motivated by a desire to undermine the Union's bargaining power, and as such constituted a clear violation of § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1).[13] *NLRB v. Exchange Parts Co.,* 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); *NLRB v. Orleans Manufacturing Co.,* 412 F.2d 94, 96–97 (2d Cir. 1969); *NLRB v. Yokell* 387 F.2d 751, 755–56 (2d Cir. 1967).

In the course of the strike, a number of Union members engaged in incidents involving mass picketing, threats, assaults and some property damage. The administrative law judge summarized his findings as follows:

Union Representative Brown accompanied by striking employees forcibly entered the Employer's nursing home during the strike; Union Representative Brown accompanied by striking employees and others followed non-striking employees to and from work and repeatedly threatened them with physical harm and property damage; striker Dean, also a picket captain for the Union, called in a bomb-scare to the nursing home during the strike; Union Representative Ciulla threat-

10. ·When before the Board, the Company filed 303 exceptions to the decision of the administrative law judge.

11. The administrative law judge found that the alleged bribe had not been offered.

12. Since the dismissal of employee Tierney was eventually found to be justified because there was no bribe offered, the Board found the Union's strike to be an economic strike rather than an unfair labor practice strike. This distinction has particular importance with respect to the reinstatement of strikers. Unfair labor practice strikers are entitled to reinstatement with back pay even if they have been replaced during the strike. *See Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956). Economic strikers may request reinstatement through their union, and, once that request is made, the employer must offer reinstatement to those employees for whom there are available positions. *NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); *The Laidlaw Corp.,* 171 NLRB No. 175 (1968), enf'd, 414 F.2d 99 (7th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). *See generally H. & F. Binch Co. v. NLRB,* 456 F.2d 357 (2d Cir. 1972).

13. The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must slow and which may dry up if it is not obliged.
*NLRB v. Exchange Parts Co.,* 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964).

ened non-striking employee Rich with property damage; Union representatives participated in mass picketing, blocking the ingress and egress of non-strikers and banging on cars; Union Representative Morico kicked a car and cursed at and threatened management and, thereafter, attempted to run one of the Company's representatives off the road during the strike; striker Dean threw small rocks or pebbles at a supervisor's car attempting to leave the facility during the strike; strikers Mary J. Fazzino and Linda Alger assaulted a non-striker and damaged her property; and Union representatives threatened, followed and harassed management's representatives as they attempted to enter and leave the facility. And, as found *supra,* . . . even before the strike Union representatives repeatedly attempted to enter the Employer's facility without permission.

On the basis of these facts, the judge concluded as follows, borrowing the language of *Laura Modes Co.,* 144 NLRB 1592, 1596 (1963):

[I]n the particular circumstances of this case the policies of the Act and the legitimate interests of the public and the parties will best be served by denying the Union the right to invoke our statutory processes in aid of a demand for recognition as bargaining representative of Respondent's employees unless and until it demonstrates its majority among those employees through the Board's election procedures.

The Board concluded, however, that the misconduct involved "only a handful" of the striking employees and, except for three instances of mass picketing and a threat of like conduct in the future made in August, 1971, was engaged in only during the early weeks of the strike. The Board said that the

misconduct consisted of some threats and name calling directed at non-striking employees, two instances of car following, two or three instances of hitting nonstrikers' cars with fists and

pebbles or pieces of gravel as they passed through the picket line, unsuccessful attempts to block entrance to the Respondent's premises, one instance of property damage inflicted by [a] striker throwing a bottle on the windshield of a nonstriker's automobile, and one instance of attempted forcible entry which was successfully blocked by Respondent with the help of police. There were no physical assaults upon employees or supervisory personnel, and only one incident of actual property damage. The non-striking employees continued to report to work and were able to enter Respondent's premises without harm.

Viewing the case in perspective, the Board found a few instances of misconduct by a relatively small proportion of strikers, which occurred only sporadically in the context of a four month long strike and against a background of .the Company's frequent and recurring unfair labor practices. It therefore concluded that "the extraordinary sanction of withholding an otherwise appropriate remedial bargaining order" would not be employed. The Board, expressing reluctance to deprive a substantial group of employees of the benefit of collective bargaining because of the misconduct of "a few miscreants," therefore issued a *Gissel* bargaining order. *See* Carson, *The* Gissel *Doctrine: When a Bargaining Order Will Issue,* 41 Fordham L.Rev. 85 (1972).

■ In taking this position, the Board did not "mischaracterize" the Union's illegal activity as petitioners charge. Rather, it balanced the Union's illegal activities during the strike against the Company's actions both before and after the strike, measuring, as was its duty, the effect of the Company's violations against the gravity of the Union's misconduct in deciding whether a bargaining order was appropriate. *See generally NLRB v. World Carpets of New York,* 463 F.2d 57, 62 (2d Cir. 1972) ("minimal" misconduct by employer weighed against violence by union officials intimidating

employees did not justify bargaining order).

■ The teaching of *NLRB v. Gissel Packing Co., supra,* is that it is within the Board's power to issue a bargaining order in a situation where a company's unfair labor practices are of a kind that interfere with the election process and tend to preclude the holding of a fair election. The remedy of a bargaining order is appropriate (1) where the unfair labor practices are so pervasive that there is no other way of remedying their effect or (2) when the unfair labor practices, while less substantial, are such that "the possibility of erasing the effects of past practices and of ensuring a fair election . . . is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." 395 U.S. at 614–15, 89 S.Ct. at 1940.[14]

The administrative law judge apparently felt that a fair election was still possible, in spite of the Company's misconduct, but even this is somewhat unclear since the judge's recommendation to deny the bargaining order was apparently based much more on his reluctance to benefit a Union which he viewed as responsible for pervasive misconduct than upon an explicit finding concerning the likelihood of a fair election.

The Board explicitly found that the prospect of having a fair election was doubtful if not impossible and that this was due solely to the Company's unlawful activity.

[The Company's] parade of 8(a)(1) violations, and its unlawful grant of bonuses have . . . so indelibly imprinted in its employees' consciousness both the fear of retaliation against legitimate concerted activity and the available rewards for refraining therefrom that no free election can be held here.

■ On the basis of the record developed by the administrative law judge, the Board's conclusions are supported by substantial evidence. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The record is replete with instances of employer misconduct which would have made it difficult if not impossible for a fair election to have taken place. The only real question is the propriety of issuing a bargaining order here regardless of the employer's misconduct. To be sure, there have been instances where this court and others have refused to enforce a bargaining order issued by the Board. In *NLRB v. World Carpets of New York, supra,* this court's refusal to enforce a bargaining order rested primarily upon a failure by the Board to demonstrate that the employer's misconduct was substantial enough to have prejudiced the chances for a free election. In *NLRB v. M. H. Brown Co.,* 441 F.2d 839 (2d Cir. 1971), this court's refusal to enforce a bargaining order was again precipitated by an absence of substantial violations by the employer. *See NLRB v. General Stencils, Inc. (I),* 438 F.2d 894 (2d Cir. 1971) (remanding a case involving a bargaining order for insufficient facts), and *NLRB v. General Stencils, Inc. (II),* 472 F.2d 170 (2d Cir. 1972) (refusing to enforce a bargaining order because of insufficient facts showing that a fair election was impossible). *See also NLRB v. Gibson Products Co.,* 494 F.2d 762 (5th Cir. 1974); *Peerless of America, Inc. v. NLRB,* 484 F.2d 1108 (7th Cir. 1973); and cases cited in Carson, *supra,* at 106–14.

■ Here, however, the Company's illegal conduct in connection with the Union's organizational efforts amounted to a purposeful attempt to intimidate its employees. The effect of its efforts was the creation of an abiding atmosphere of coercion severely limiting the free choice of employees. It is in just such a situation that the issuance of a remedial bargaining order by the Board is appropriate.

---

14. It was explicitly found by the administrative law judge that "a majority of employees in a unit appropriate for collective bargaining voluntarily and knowingly signed valid Union authorizations designating the Union as their bargaining agent by March 1 and April 7."

The excesses by the Union in the course of its strike were unwarranted and illegal; they subject it to appropriate remedies under § 8(b), 29 U.S.C. § 158(b). And the inability of the Union better to control its strikers cannot be condoned. But we simply cannot find, on balance, that the Union activity should foreclose the issuance of this bargaining order. Here only four [15] strikers were not reinstated because of their conduct during the strike. They were treated as they should have been. The gravity of their conduct, and that of the other strikers, when balanced against the effect of the employer's violations, shows the Board's determination to be a reasonable exercise of its broad remedial authority. *See NLRB v. Gissel Packing Co.,* 395 U.S. at 612 n.32, 89 S.Ct. 1918. *Cf.* Carson, *supra,* at 102–05.

The fashioning of remedies is particularly difficult where, as here, the legal standard to be applied involves a balancing test and both sides are shown to have been guilty of misconduct. Ultimately the collective facts when sorted and collated show the Company to be the more guilty party; this together with (1) the existence of valid authorization cards from a majority of the employees in the bargaining unit; (2) a substantially supported finding that a fair election would be impossible; (3) a clear causal link between the Company's substantial misconduct and present inability to conduct a free election; (4) the extensiveness of the Company's misconduct both before and after the strike which indicated a likelihood that such conduct would continue if an election were held; and (5) the Union's demonstrated good faith in submitting to the legal process up to the time that the Company refused to recog-

nize the Union's card majority,[16] justifies the bargaining order here. Petitioners devote some 40 pages in their brief to a careful fragmentation of each of the alleged instances of Union misconduct, in an effort to show its organizational effort to have been a "vicious campaign of terror." We defer to the Board's approach in refusing to view individual factual incidents apart from their larger framework, and its ultimate resolution of the mixed question whether the ·Union's activities on the whole were of a kind that should preclude a bargaining order. *Cf. NLRB v. Seven-Up Bottling Co.,* 344 U.S. 344, 346, 73 S.Ct. 287, 97 L.Ed. 377 (1953); *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 198, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); *MPC Restaurant Corp. v. NLRB,* 481 F.2d 75, 79 (2d Cir. 1973). *See also* 4 K. C. Davis, Administrative Law Treatise § 30.04 at 209–10. Rather than begin another round of threats and reprisals we will enforce the Board's order. *Cf. Seeler v. The Trading Port, Inc.,* 517 F.2d 33, 40 (2d Cir. 1975).

Petitioners' remaining claim centers on the reinstatement of two strikers, Izzo and Adorno. The administrative law judge concluded that both were properly denied reinstatement.[17] The Board disagreed. At issue is whether the facts as found by the trial judge and reviewed by the Board constitute the kind of serious misconduct which justifies the denial of reinstatement, *NLRB v. Fansteel Metallurgical Corp.,* 306 U.S. 240, 256–61, 59 S.Ct. 490, 83 L.Ed. 627 (1939), or merely "rough trivial incident[s]" which, when viewed in the context of a four month long strike are not of a serious nature, *e. g., NLRB v. Terry Coach Industries, Inc.,* 411 F.2d 612 (9th Cir. 1969).

---

**15.** The administrative law judge found six strikers to be undeserving of reinstatement. The Board reduced that number to four. *See* text at n.16 *infra.*

**16.** In noting this, we in no way condone the Union's later activities. They cannot be said to have been caused by the Company's refusal to bargain, and even if this were the case, that would not justify the Union's illegal conduct. The Union's pre-strike activity is important only inasmuch as it can be contrasted with a situation such as that present in *Laura Modes*

*Co.,* 144 NLRB 1592 (1963), where the Board withheld a bargaining order in a situation where the union evidenced a "total disinterest in enforcing its representation rights through the peaceful legal process provided by the Act."

**17.** The Board upheld the administrative law judge's findings that petitioners did not violate § 8(a)(3) and (1) of the Act by refusing to reinstate employees Dean, Betzner, Fazzino and Linda Alger on account of strike misconduct.

The evidence showed that striker Izzo together with others tried to prevent a nonstriker (Armstrong) from driving into the Company's grounds, and that Izzo put her head inside Armstrong's car and said "you know what we do to scabs." Striker Adorno's illegal conduct consisted primarily of being present with a carload of people from the picket lines who went to Armstrong's home with the avowed purpose of talking with her (but were apparently frightened away by the appearance of a relative of Armstrong with a 13-foot boa constrictor wrapped over her shoulders), and eventually issued threats to the nonstriker about crossing the Union picket lines. The Board's conclusion that these strikers were not guilty of conduct sufficiently serious to support the denial of their reinstatement is supported by credible evidence. *NLRB v. Hartmann Luggage Co.*, 453 F.2d 178 (6th Cir. 1971). *Cf. Southern Steamship Co. v. NLRB*, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246 (1942) (unlawful sitdown strike by seamen in domestic port).

Petition to review denied; cross-petition to enforce granted.