Anna **ALLEN**, Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent,

**Yellow Freight System, Intervenor.**

No. 76–1619.

United States Court of Appeals, District of Columbia Circuit.

Argued May 4, 1977.

Decided July 26, 1977.

Rehearing Denied Sept. 1, 1977.

---

Bensonetta E. Tipton, Atlanta, Ga., with whom Albert M. Horn, Atlanta, Ga., was on the brief, for petitioner.

Christopher Katzenbach, Atty., N. L. R. B., Washington, D. C., for respondent. John S. Irving, Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., were on the brief, for respondent.

Claud L. McIver, III, Atlanta, Ga., was on the brief, for intervenor.

Before WRIGHT, McGOWAN and TAMM, Circuit Judges.

Opinion for the court filed by J. SKELLY WRIGHT, Circuit Judge.

TAMM, Circuit Judge, dissents.

J. SKELLY WRIGHT, Circuit Judge:

This case is before the court on the petition of Anna Allen, the charging party below, to review an order of the National Labor Relations Board, 224 NLRB No. 181

(June 18, 1976), JA 27.[1] The Board, in a two to one decision, dismissed Allen's complaint in its entirety and thereby reversed the findings of the Administrative Law Judge (ALJ) who had held that Yellow Freight System—Allen's employer and the intervenor here—had violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act. 29 U.S.C. §§ 158(a)(1), 158(a)(3) (1970).[2]

Having reviewed the entire record, we reverse the Board's order and remand the case for further proceedings.

## I

The standard of review to be applied in this case is clear. We are to sustain the Board's determinations if they are supported by substantial evidence on the record considered as a whole. Sections 10(e) and 10(f) of the NLRA, 29 U.S.C. §§ 160(e), 160(f) (1970); *NLRB v. Brown*, 380 U.S. 278, 290–291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 496–497, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Local 441, Int. Brhd of Elec. Wkrs v. NLRB*, 167 U.S.App.D.C. 53, 55, 510 F.2d 1274, 1276 (1975); *Int. Ladies' Garment Wkrs U. v. NLRB*, 150 U.S.App. D.C. 71, 83, 463 F.2d 907, 919 (1972). It is equally clear, however, that the Board's determinations should not be sustained if, after a full review of the record, we are unable conscientiously to conclude that the evidence supporting the Board's determination is substantial. *NLRB v. Brown, supra*, 380 U.S. at 290, 85 S.Ct. 980; *Universal Camera Corp. v. NLRB, supra*, 340 U.S. at

488, 71 S.Ct. 456; *Midwest Regional Joint Board v. NLRB*, 183 U.S.App.D.C. —— at ——, 564 F.2d 434, at 438 (decided June 24, 1977); *Mueller Brass Co. v. NLRB*, 544 F.2d 815 (5th Cir. 1977). The Board's orders, therefore, are neither open to *de novo* redetermination nor immune from all review. We have examined the facts in this case with the nature and scope of our function firmly in mind.

## II

Yellow Freight System is engaged in interstate transportation of freight by motor carrier and maintains an office and freight terminal in Marietta, Georgia for this purpose. The Marietta terminal is the only facility involved in this proceeding. 224 NLRB No. 181 at p. 1 of ALJ's decision, JA 34.

Jack D. McClure, the branch manager at the terminal since February 1975, was in charge of the company's general operations out of Marietta. He had supervisory authority over all employees at the terminal, clerical as well as non-clerical, with the sole exception of Anna Allen. *Id.* at p. 2 of ALJ's decision, JA 35. Robert Cowles, vice president in charge of sales for the company, also worked at the Marietta terminal and Allen served as his personal secretary. Cowles and Allen were independent of the rest of the terminal's operations. *Id.* Both Cowles and McClure were responsible to George Powell, III, the division manager of the company's southeast division which was headquartered in Kansas City, Missouri.

---

1. This court has jurisdiction under § 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f) (1970).

2. 29 U.S.C. § 158 (1970) provides, in pertinent part:
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

   *     *     *     *     *     *

   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[.]

29 U.S.C. § 157 (1970), referred to in § 158(a)(1) *supra*, guarantees employees the right to form, join, or assist labor organizations, to bargain collectively, to engage in other concerted activities for their mutual aid or protection, and to refrain from any or all such activities.

The Board has consistently observed that violations of any of the other subdivisions of § 8(a), 29 U.S.C. § 158(a), are also violations of § 8(a)(1), 29 U.S.C. § 158(a)(1). C. Morris, The *Developing Labor Law* 66 (1971). Here, however, the alleged § 8(a)(1) violation is independent of the alleged § 8(a)(3) violation.

*Id.* For the brief period from the time McClure began working at the Marietta terminal in February 1975 until a reorganization of the company in April 1975, however, McClure had been immediately responsible to Cowles. *Id.*

The drivers and dock workers at the terminal were represented by Teamsters Local Union No. 728 affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. The clerical employees at the terminal were not represented by a union. McClure testified that the subject of a union representing the clerical employees had been brought to his attention after he began working at the Marietta terminal. On an undisclosed date two officials of the Teamsters Local Union "came to the terminal and told him 'this was a union office,'—claiming that when [Yellow Freight] purchased the Adley (Company) in 1972, it assumed the union contract in effect with Adley covering office clerical employees." *Id.* at p. 2 of ALJ's decision, JA 35; *see also* JA 146–147. McClure responded that this was a matter to be determined by someone other than himself, and that his position at the moment was that no union represented the office clerical workers. 224 NLRB No. 181 at p. 2 of ALJ's decision, JA 35.

### A. *The Section 8(a)(1) Violation*

Early in 1975 certain "permanent" office employees at the terminal were laid off. Of those later recalled, some were working only part time. *Id.* Also employed were two clericals referred to as "casual" employees. One was Betty Hildebrand, the sister of a permanent employee, and the other was Anna Allen's daughter, Melanie Allen. McClure testified that despite her casual status Melanie Allen was working full time (*i. e.,* 40 hours every week). *Id.* at p. 3 of ALJ's decision, JA 36. Testimony also indicated that the company had a nepotism rule prohibiting employment in the same terminal of two or more employees who were related to each other. Although no manual or other document was introduced that referred to such a rule and there

was no evidence that it had ever been enforced, neither was there any evidence that—prior to the employment of the two casuals in question—there had ever been an occasion when two or more relatives had been employed at the same terminal. *Id.* at p. 4 of Board's decision, p. 3 of ALJ's decision, JA 30, 36.

Cowles testified that shortly before May 22, 1975 Powell called to instruct him that Melanie Allen should be discharged. Cowles said that Powell told him that Melanie "was working casual, and other employees were complaining that they were either laid off or were not working full time, and they felt that she [Melanie] shouldn't have the job, or that they should have one of those jobs." *Id.* at p. 3 of ALJ's decision, JA 36. Cowles testified that he, in turn, told Anna Allen that Powell had called to tell him that McClure said that "there were six office employees . . . who either had signed or were considering signing union cards because there were two casual employees . . . who were also relatives of permanent employees, and that these office employees were afraid in case of a layoff, that they would be laid off rather than these casual employees." *Id.* at p. 4 of Board's decision, p. 3 of ALJ's decision, JA 30, 36.

Later that day, according to the ALJ's findings, Allen went into McClure's office to discuss the threatened discharge of her daughter. McClure told her, "I am sick because I have caused this thing . . . I did have the report about the union sentiment, and I have reported it. I was told by George Powell, III, to let both Melanie and Betty Hildebrand go today, but that [*sic*] I am so upset over it that I'm thinking about resigning myself." *Id.* at p. 3 of ALJ's decision, JA 36. McClure testified that he discharged Melanie Allen the following day, pursuant to the "operation manual" requirement that relatives may not be employed in the same terminal. *Id.* at p. 4 of ALJ's decision, JA 37.

On these facts the ALJ held that the statements made to Anna Allen on May 22 "plainly had the tendency of discouraging

union membership among [Yellow Freight's] office clericals and thereby violated Section 8(a)(1), as alleged." *Id.* The ALJ stated:

> [Yellow Freight] was aware for a substantial period that the two clericals, having "casual" status, are relatives of "permanent" employees at the terminal. Nothing was done concerning the ostensible breach of the nepotism rule until McClure and Powell received the reports of complaints from office employees that [Yellow Freight's] retention of the casual employees was affecting their job security and they had signed or were considering signing union cards. The statements made by Cowles and McClure to Anna Allen, on May 22, predicated the decision to discharge Melanie Allen and Betty Hildebrand upon the factor, in significant part, that the protesting office employees contemplated or were joining the union.
> * * *

*Id.*

The Board, with Member Fanning dissenting, reversed the ALJ and held that the company had not violated Section 8(a)(1). The majority conceded that, "[v]iewed in isolation and read literally," Cowles' statement to Anna Allen on May 22 "may lend itself to an interpretation that union considerations motivated the discharge of Melanie Allen and Hildebrand." *Id.* at p. 4 of Board's decision, JA 30. The majority went on to say, however, that "a complete and accurate understanding of [Cowles' statement] must take into account the context in which Coweles' [*sic*] statement was made. When it is, a message reasonably conveyed is that [Yellow Freight's] discharge of Melanie Allen and Hildebrand was influenced by the legitimate economic concerns of the employees." *Id.* at pp. 4–5 of Board's decision, JA 30–31.[3]

■ After careful study of the record, we cannot find substantial evidence to support the Board's holding on this point. Indeed, we find that not only the statements made by Cowles and McClure, but also the context in which they were made—the fac-

tor on which the Board relied so heavily—clearly point to anti-union sentiment as a principal motive for the discharge of Melanie Allen and Hildebrand.

The record plainly shows that there was significant union activity among the clerical workers at the Marietta terminal. McClure himself testified that after assuming his new duties as branch manager in February 1975 he was approached by union officials who declared that they had previously represented the office employees and assumed that the union contract was still in force. The company also knew that several office employees had signed or were interested in signing union cards. It was against this background that the company took action to eliminate the one catalyst for union involvement that is revealed in the record—the full-time employment of two casual clericals while some permanent employees had been recalled only for part-time work. In this setting the company's discharge of the two casual clericals was proscribed under Section 8(a)(1), as is apparent from precedents construing that section. In *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964), the Supreme Court said:

> The broad purpose of § 8(a)(1) is to establish "the right of employees to organize for mutual aid without employer interference." *Republic Aviation Corp.* v. *Labor Board*, 324 U.S. 793, 798, [65 S.Ct. 982, 985, 89 L.Ed. 1372] [1945]. We have no doubt that it prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect. In *Medo Photo Supply Corp. v. Labor Board*, 321 U.S. 678, 686 [64 S.Ct. 830, 834, 88 L.Ed. 1007] [1944], this Court said: "The action of employees with respect to the choice of their bargaining agents may be induced by favors bestowed by the employer as well as by his threats or domination." * * *

---

3. The Board apparently ignored altogether McClure's statements to Anna Allen.

The Supreme Court's reasoning in *Exchange Parts Co.* has been applied repeatedly in subsequent cases. *Int. U., United Auto., Aerosp. & Agric. Implement Wkrs v. NLRB,* 147 U.S.App.D.C. 289, 298, 455 F.2d 1357, 1366 (1971); *Int. U., United Auto., Aerosp. & Agric. Implement Wkrs v. NLRB,* 129 U.S.App.D.C. 196, 201, 392 F.2d 801, 806 (1967), *cert. denied,* 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968); *Donovan v. NLRB,* 520 F.2d 1316, 1320 (2d Cir. 1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976); *NLRB v. Rollins Telecasting, Inc.,* 494 F.2d 80, 83–84 (2d Cir.), *cert. denied,* 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974); *NLRB v. Scoler's Incorporated,* 466 F.2d 1289, 1291 (2d Cir. 1972); *NLRB v. Drives, Inc.,* 440 F.2d 354, 363–364 (7th Cir.), *cert. denied,* 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1971); *NLRB v. Varo, Inc.,* 425 F.2d 293, 298 (5th Cir. 1970).

It is true that the benefit conferred by the company in the instant case did not take the usual form of, for example, a wage increase or extra holiday. But the firing of the two casual employees did have the same intended purpose as more commonly granted benefits—to quiet unrest in employee ranks and to remove an incentive for unionization. It is also true that conferral of benefits by an employer is not necessarily forbidden if the benefits are granted solely for independent business reasons. *NLRB v. Styletek, Division of Pandel-Bradford, Inc.,* 520 F.2d 275, 280 (1st Cir. 1975). Nor are benefits forbidden if they are granted in a manner and at a time in accord with past practice and are not prompted by the possibility of unionization. In this case, however, any claim that the company's discharge of the casual employees was not related to union considerations is wholly belied by the statements made by company officials at the time of the discharges.

## B. *The Section 8(a)(3) Violation*

At the hearing before the ALJ several witnesses testified as to Anna Allen's conduct in the period following the discharge of her daughter. There was testimony that in conversation with other employees Allen complained about what she termed McClure's unjustified action in firing Melanie, that she criticized his performance as branch manager, and that she told one employee, who apparently was her daughter's replacement, that everyone resented her and that her job was in jeopardy. 224 NLRB No. 181 at p. 2 of Board's decision, pp. 4–5 of ALJ's decision, JA 28, 37–38. Also, the Board found that Allen told the company's two black clerical employees that McClure was prejudiced against them and she suggested to at least one of these employees that membership in a union might provide needed protection. *Id.* Some of the employees who had heard such comments from Allen related them to McClure and, in certain instances, sought reassurances from him that they were not true. *Id.*

As already noted, McClure had no supervisory authority over Allen, but he did pass on to Division Manager Powell the reports he had received concerning Allen's comments. Cowles testified that on about May 28 Powell telephoned him to say that Allen had been interfering with the operation of the Marietta office, that she had been enjoying special privileges, and that he should speak to her. As a result of this conversation with Powell, Cowles asked Allen not to park in his parking place while he was away and to discontinue whatever other "small things" had concerned Powell. Cowles told her that if she had been "creating a disturbance in the office, whatever it was, not to do it any more, because the people were complaining." *Id.* at p. 5 of ALJ's decision, JA 38. Allen responded that, except for parking in Cowles' place, she was not doing anything objectionable and was not "interfering in the context that they said she was." *Id.* Cowles testified that he "had to accept that," and he "assumed that everything was all right." *Id.* Cowles was never told specifically in any conversation with Powell exactly what Allen had done wrong other than Powell's complaint about parking.

On June 10 Powell called Cowles in Birmingham, Alabama and instructed him to discharge Allen because she was "still creating problems." *Id.* at p. 5 of ALJ's decision,

JA 38. Cowles returned to Marietta and met Allen after working hours. He told her that the only reason given to him for her discharge was that she was creating "an office disturbance." *Id.* at p. 6 of ALJ's decision, JA 39. She said she would not accept being discharged while she was off duty. Rather, she planned to come to work in the morning and wanted a letter from the company giving reasons for her discharge.

On the morning of June 11 Allen was met in the parking lot at the Marietta terminal by Powell, Cowles, and McClure. Powell told her that she was fired and could not go into the terminal. Allen asked to be informed of the reasons for the discharge. Powell told McClure to discuss this with her. McClure testified that he asked Allen, "Did you advise the black employees that I hated them and that they should join the union to protect their jobs from me?" Allen replied that she had not. McClure then turned to Powell and said, "I see no sense in furthering this discussion." *Id.*

McClure testified that Allen then requested a letter stating the reasons for her dismissal and Powell asked Cowles to write such a letter. Cowles replied that he did not know of any reason to discharge Allen. Accordingly, Powell instructed McClure to tell Cowles what the letter should say. Cowles and McClure went into the terminal, while Powell stayed in the parking lot with Allen. Allen testified that Powell told her that she had been an excellent employee and that he did not know what had happened, but that he "had to take the word of the official of his company." *Id.*[4] McClure testified that inside the terminal he told Cowles that "she's been calling the black employees here, telling them I hated them, that I'm going to discharge them, and that they better join the union to protect themselves from me." Cowles testified that he typed the letter, putting in what McClure had told him. Cowles had McClure "review" the letter and then Cowles signed it and gave it to Allen. *Id.* The full text of the letter reads as follows:

> I have Been [*sic*] advised by Mr[.] McClure that you have called office employees of Yellow Freight System asking them to join the union and that you have advised at least two of our black employees that Mr. McClure hates blacks and was going to fire them. It is therefore necessary to terminate your employment as of this date.

JA 49.

■ As to whether the discharge of Allen was lawful or unlawful under Section 8(a)(3), there is no question concerning the relevant test. "A discharge is unlawful if motivated even in part by anti-union animus * * *." *Ridgely Manufacturing Co. v. NLRB,* 166 U.S.App.D.C. 232, 233, 510 F.2d 185, 186 (1975). *See also NLRB v. Central Press of California,* 527 F.2d 1156, 1158 (9th Cir. 1975); *NLRB v. Broyhill Co.,* 514 F.2d 655, 660 (8th Cir. 1975); *NLRB v. D'Armigene, Inc.,* 353 F.2d 406, 409 (2d Cir. 1965). Indeed, "the cases are legion that the existence of a justifiable ground for discharge will not prevent such discharge from being an unfair labor practice if partially motivated by the employee's protected activity; a business reason cannot be used as a pretext for discriminatory firing." *NLRB v. Ayer Lar Sanitarium,* 436 F.2d 45, 50 (9th Cir. 1970) (citing cases).

■ Determining whether anti-union animus was at least a part of the motivation behind the discharge of an employee can, at times, be very difficult. In the instant case, however, the inquiry has been simplified. When asked by the discharged employee to explain the reasons for the discharge, company officials themselves offered—first orally, then in writing—anti-union considerations as a significant part of their explanation. Given the company's explicit reliance on anti-union animus in explaining the discharge, it would take very powerful external evidence to refute the logical conclusion that this discharge constituted a violation of Section 8(a)(3). However, not only does the record fail to provide such countervailing evidence, but the

---

4. Powell did not testify.

additional evidence that is in the record actually reinforces the plain language of the letter.

As has already been pointed out, the company knew of union sentiment at the terminal and was concerned about it. Division Manager Powell, who ordered Cowles to fire Allen, told her at the time of the discharge that she had been an excellent employee—hardly the language that would ordinarily be used to describe someone about to be dismissed. Moreover, the ALJ found (and the Board did not disturb this finding) that Allen was never specifically warned of, or requested to discontinue, the conduct the company claims justified her discharge.[5] Given all the circumstances of this case, the suggestion that anti-union animus was not a cause for Allen's firing is simply incredible.[6]

In short, we hold that the Board's finding against a Section 8(a)(3) violation, like its finding against a Section 8(a)(1) violation, lacks substantial evidence to support it. We accordingly remand the case to the Board for further proceedings consistent with this opinion.

*So ordered.*

TAMM, Circuit Judge, dissents.

---

**5.** Neither was there any investigation of the truth of the allegations that Allen had told black employees that McClure was prejudiced—statements that Allen consistently denied having made. 224 NLRB No. 181 at p. 7 of ALJ's decision, JA 40.

**6.** In this case the Board disagreed with the ALJ's findings concerning both the alleged § 8(a)(1) and § 8(a)(3) violations. Particularly because both alleged violations raise important questions of credibility, we take note of the Supreme Court's admonition in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456 (1951):

The "substantial evidence" standard is not modified in any way when the Board and its examiner [*i. e.*, the ALJ] disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case. * * *