NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

TRIUMPH CURING CENTER and M. F.
Lee d/b/a Lee's Sewing Company,
Inc., Respondents.

No. 76–2884.

United States Court of Appeals,
Ninth Circuit.

March 2, 1978.

Mary K. Schuette (argued), Washington, D. C., for petitioner.

J. Mark Montobbio (argued), of Severson, Werson, Berke & Melchior, San Francisco, Cal., for respondents.

* Honorable William J. Jameson, Senior District Judge for the District of Montana, sitting by designation.

Before BROWNING and HUFSTEDLER, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

This case is before the court upon the petition of the National Labor Relations Board (NLRB), pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), for enforcement of its order issued on January 29, 1976, against respondents Triumph Curing Center, Inc. (Triumph) and M. R. Lee, doing business as Lee's Sewing Company (Lee). The Board found that the respondents had engaged in unfair labor practices within the meaning of Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act and ordered the companies to recognize and bargain with the International Ladies Garment Workers Union (Union) as the authorized representative of the pressing employees working at Lee's plant at 1875 Mission Street, San Francisco.[1] The Board's decision and order is reported at 222 NLRB No. 103.

In its decision and order the Board adopted the findings, conclusions and recommended order of the administrative law judge who presided over a fourteen day hearing held during March and April, 1975. The judge had concluded, *inter alia*, that (1) Triumph and Lee were an integrated enterprise and joint employer; (2) respondents violated Section 8(a)(1) of the Act by soliciting employees to withdraw from the Union, by offering Triumph employees jobs at Lee if they resigned from the Union, and by assisting employees in procuring their withdrawal from the Union; and (3) respondents violated Sections 8(a)(5) and (1) of the Act by engaging in sham bargaining at the premises of Triumph, by deviously transferring Triumph's operations at Lee, and by

1. Lee also has two other plants in San Francisco.

denying the Union recognition at Lee after Triumph closed. The Board found also that Triumph employees who engaged in a strike were unfair labor practice strikers and that their misconduct did not require denial of a bargaining order.

We find substantial evidence in the record as a whole to support the Board's findings and conclude that its order must be enforced.

*Factual Background*

Floyd Andrews is a general contractor in the garment industry in San Francisco. He contracts with manufacturers, which design and market garments, to manufacture their products for them. In turn Andrews arranges with subcontractors to cut, sew, and press the garments.

Until Triumph closed its operations in May, 1974 it was a subcontractor engaged solely in the pressing of new clothing. It was owned by Andrews and his wife. Lee is a subcontractor engaged in cutting, sewing and pressing clothing. Before Triumph closed, Lee was engaged chiefly in sewing. Although Lee is ostensibly a sole proprietorship owned by Marian Lee, as set out below, its operations at 1875 Mission are controlled by Andrews.

Triumph recognized the Union without an election in 1965. They were parties to several collective bargaining agreements, the most recent of which ran from September 1, 1970 to September 1, 1973. In May, 1973, a Union representative, Mattie Jackson, gave Triumph notice that the Union did not want to renew the existing agreement and desired to renegotiate it. Negotiations were delayed while she was engaged in bargaining with another company.

The parties first met on November 13, 1973. Prior to that bargaining session Andrews met with his negotiator, Charles Hom, to review the existing agreement. Andrews was concerned that certain clauses could jeopardize Triumph's business. He feared that the Union would use those clauses to organize his non-union customers and instructed Hom to eliminate the clauses from the new agreement.

After the initial meeting, Jackson encountered difficulties in arranging the second. Andrews said that January would be the earliest time possible. Jackson then proposed December 13, but received no response. As a result, the Union filed an unfair labor practice charge. The charge was subsequently withdrawn after bargaining resumed.

Between January 15 and May 8, 1974, the parties held numerous bargaining sessions, but were unable to reach an agreement, despite the intervention of federal mediators. In particular, they could not agree on the contract clauses which Triumph sought to delete because of its fear that the Union might use "these clauses to organize the non-union customers of Triumph".

On March 29, the employees of Triumph went on strike to protest the company's conduct at the bargaining table. The strike persisted throughout April while the parties continued to negotiate. On April 29, Hom told Jackson that Triumph's future looked "bright". On May 2, he told Jackson that Triumph was considering closing. On May 8, Triumph closed down all operations. Lee opened a pressing operation at its plant at 1875 Mission, and the strikers moved the picket line there. The picket line continued for over a year, although on October 8, 1974, Jackson sent Andrews a letter notifying him that the strike had officially terminated and conveying the offer of all the striking employees to return to work. · ·

*Issues Presented*

1. Whether substantial evidence on the record as a whole supports the Board's finding that Triumph and Lee are a joint employer and single integrated enterprise.

2. Whether substantial evidence on the record as a whole supports the Board's findings that respondents violated Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act.

3. Whether the Board properly concluded that strike and picket line misconduct by

certain Union organizers did not require denial of a bargaining order.[2]

## I.

### The Joint Employer Issue

The propriety of the Board's findings of unfair labor practices turns upon the threshold question of whether Triumph and Lee were a joint employer and integrated enterprise. *Cf. Darlington Manufacturing Co. v. NLRB*, 397 F.2d 760, 763 (4 Cir. 1968), *cert. denied* 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1969). Respondents contend that inasmuch as Triumph and Lee were under separate ownership, operated at separate locations, and had separate payrolls, employees, and working conditions, they were separate business entities. They rely upon *Milo Express Inc.*, 212 NLRB 313 (1974) to support their position.

In *Milo Express*, the Board found that two trucking companies owned by the same persons were not an integrated enterprise. Respondents argue that because they were not commonly owned this case is even stronger against a finding of an integrated business. In *Milo Express*, however, except for common ownership, the two trucking companies had no operational relationship. One company operated intrastate, the other interstate. They had separate equipment, management, payrolls and bookkeepers. With limited exceptions, the two companies operated independently, without any intra-company dealings.

In contrast, Triumph and Lee were highly interdependent operations, supervised by Andrews, as integral parts of his garment production operations. Nearly all of Lee's cutting and sewing work at 1875 Mission Street was obtained by Andrews and all of the garments sewn by Lee were pressed by Triumph. The sewn, but unpressed, garments were transported to Triumph in Lee's trucks and then, after pressing, delivered to the marketing company the same way. Andrews was financially responsible for the finished garments produced by his subcontractors and asserted considerable control over their day to day operations. He interviewed prospective employees for Lee, assisted in hiring and firing, and was authorized to sign payroll checks. Although Lee had a plant manager, Al Young, Andrews admitted that he had final supervisory authority and used that authority to direct the work at Lee.

Andrews owned all of the sewing machines at Lee's Mission Street plant. He leased the premises and paid the rent and was not reimbursed by Lee, except for those limited times when Lee was not working on garments for Andrews. No rent was paid for the sewing machines. Andrews summarized his financial control of Lee as follows:

So, in order to control this factory and make sure that I had it when I needed it, I made special arrangements with Lee so that I would have this company locked in. And so therefore, I pay the rent and I own the sewing machines at 1875 Mission Street, which is commonly done in San Francisco by many manufacturers in order to make sure they have the needles.

Although Andrews denies any ownership interest in Lee, a disinterested third party, a customer of Andrews, testified that he held himself out to her as the owner of Lee's operation on Mission Street. Andrews, Triumph and Lee also shared certain

---

**2.** Respondents also raise the issue of bias on the part of the administrative law judge by referring to comments of the judge regarding the desirability of settlement, contending that the comments show that "the Judge made up his mind without listening to the evidence, thereby depriving the Companies of a fair and impartial hearing". It is clear, however, that the quoted statements were made merely to urge settlement and avoid the time and expense of litigation. Following the quoted statements the judge stated that by his comments he was "not prejudging the case in any way" and would not decide it until all the evidence and briefs were in. Respondents do not specify any instance where the alleged bias colored the judge's judgment or his credibility resolution of the testimony. While obvious indications of judicial bias will not be disregarded, we find nothing in the record to support a conclusion that the respondents were deprived of a fair hearing by any bias of the judge. See *NLRB v. Anthony Co.*, 557 F.2d 692, 695–96 (9 Cir. 1977)..

key employees. Lee's payroll bookkeeper prepared Triumph's payroll. Another employee did all other bookkeeping for Andrews' general contracting business, Triumph, and Lee, as well as for other businesses owned or controlled by Andrews. Hom, Andrews' labor negotiator was an accountant, who performed services for Triumph and Lee, as well as Andrews. He was paid by Andrews.

Further evidence of an integrated enterprise and joint employer is found in various occurrences incident to the labor negotiations and strike. Before Triumph went on strike, Andrews ordered pressing equipment for Lee's Mission Street plant. The equipment supplier, Charles Catallo, delivered and installed the equipment, but encountered difficulty in obtaining payment. After Catallo threatened to remove the equipment, Lee's manager, Young, referred him to Hom, who directed that payment be made. The checks in payment were drawn on Lee's account and signed by Andrews. Young testified that he did not know what equipment was ordered and did not know who owned it.

After Triumph went on strike, Andrews called a meeting of Lee employees to encourage them to go to Triumph's plant to finish work left when the Triumph employees went on strike. The next day he drove a number of them to work at Triumph and they continued to work there for sometime. After Triumph closed, Lee's manager sent a letter to all former Triumph employees offering them work at Lee. For the first six months of Lee's pressing operation between 60% and 100% of Lee's pressing employees formerly had worked for Triumph. Triumph's supervisors also moved to Lee to supervise Lee's pressing operation. Some of Triumph's pressing equipment and two form finishers were transferred to Lee's plant and installed with the equipment Andrews ordered from Catallo. The new pressing operation—which was staffed by Triumph employees, supervised by Triumph supervisors and which utilized Triumph equipment—initially worked on the same contracts for the same customers as Triumph had before closing.

The Board has promulgated four criteria for determining the existence of an integrated enterprise or joint employer: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control. These criteria were recognized in *Radio Union v. Broadcast Service,* 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965). The Board has determined that no single criterion is controlling, although it considers the first three, which evidence operational integration, more critical than the fourth, common ownership. See *Sakrete of Northern California, Inc. v. NLRB,* 332 F.2d 902, 905 n. 4, (quoting NLRB, 21st Annual Report, 14–15) (9 Cir. 1964), *cert. denied* 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965).

We conclude that under the recognized criteria there is substantial evidence to support the Board's finding that Triumph and Lee constituted an integrated enterprise with a joint employer. They were two stages of an integrated garment production operation, with the work of both firms commonly managed by Andrews. Andrews owned Triumph and had Lee "locked in", so that he could supervise and direct Lee's work, including the hiring, firing and paying of employees. After Triumph closed, its work, equipment, employees and supervisors were relocated at Lee's Mission Street plant, so that concomitant with the closing of Triumph, a pressing operation opened at Lee. Only the ownership of the two firms was distinct, and this distinction was blurred by Andrews' ownership of the lease at 1875 Mission Street and the equipment used there. Andrews' domination of Triumph and Lee, and in particular his oversight of the employees and labor relations of both, justifies the Board's decision to treat respondents as a joint enterprise under the National Labor Relations Act.

## II.

### The Unfair Labor Practices

#### A. Violation of Section 8(a)(1)

Section 8(a)(1) of the Act provides that it is an unfair labor practice "to interfere

with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7 [29 U.S.C. § 157]". 29 U.S.C. § 158(a)(1). The rights guaranteed in section 7 include, *inter alia,* "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining, or other mutual aid or protection . . . ." 29 U.S.C. § 157.

In finding a violation of section 8(a)(1), the Board relied on four incidents. Two involved Mabel Ford, who was both a supervisor for Triumph and the union shop steward. She became dissatisfied with the Union because she believed she had not received all the vacation pay to which she was entitled. Ford testified that she talked to Andrews and learned that without the Union Triumph employees would receive the same benefits as Lee's employees. She ascertained from the NLRB how to withdraw from the Union, circulated a decertification petition, and informed the other Triumph employees what Andrews had told her regarding employee benefits without the Union. There was testimony that she also claimed that benefits would be greater without the Union and threatened her fellow employees that Triumph would close if they did not withdraw. Ford denied making these claims or threats, but the judge discredited her denials and credited the testimony of the other employee witnesses.[3]

The petition was unsuccessful and Ford was fined by the Union and expelled. Triumph filed an unfair labor practice charge against the Union, and the Union entered into a settlement agreement whereby the fine was withdrawn. The Union also filed charges, and the company entered into a settlement agreement whereby it agreed not to solicit signatures on any decertification petition—although it did not admit to any prior violation of the Act.

In the second incident, after the strike began, Ford called a striking employee, Mei Yuk Wan and asked her if she wanted to return to work. Wan replied affirmatively. The next day Ford told her she would have to withdraw from the Union to return to work. Ford explained to Michael Wan, Mei Yuk's son, how his mother must send a registered letter of withdrawal to the union and keep a copy to show Triumph when she returned to work. Michael typed the letter and sent it to the Union, and his mother reported to Lee's manager, Young. Young gave her the choice of working at either Triumph or Lee and she decided to return to Triumph. Later she went to work for Lee.

The third and fourth incidents involve Young and Hom. On May 20, 1974, Young sent letters to all former Triumph employees offering them jobs at Lee. Gregory King testified that in response to the letter he visited Young at Lee's plant on May 23. Hom was also present. Young told King that he could have work at Lee is he withdrew from the Union. King stated that Hom explained how to withdraw by telegram and wrote out the wording of the withdrawal. Hom admitted that he told King to write the telegram, looked up the Western Union number, and lent him Lee's telephone to place the call. King acknowledged that he knew he would have to quit the Union before he could cross the picket line, but stated he would not have quit except to get work.[4] With the assistance of

---

**3.** The judge described her testimony as "being all over the lot". At a Union trial for her conduct, she initially denied circulating the petition, but later admitted it. She also admitted at the Board hearing that at one time she had claimed the petition was to raise money for an employee who had lost her wallet.

**4.** The respondents attempted throughout the hearing to show that all of the employees whose union renunciation was allegedly solicited by respondents withdrew because respondents had told them they would be subject to fines from the Union for crossing the picket line. This was denied by all of the employee witnesses. The only time any employee was made aware of the potential for fines was when King was asked by Young to talk to Andrews and Hom several weeks before the Board hearing. This meeting was intended to "refresh" King's recollection of the events surrounding the closing of Triumph. Hom told him then, for the first time, that if he had not quit the Union he would have been fined for crossing the picket line.

Young and Hom his withdrawal was successful, and he returned to work at Lee, where he did the same job as he did before at Triumph, working on the same form finishers he used at Triumph.

Artemio Sayio, Jr., another striker, encountered similar treatment. After receiving Young's letter he called Ford, who referred him to Young. Young told him there was work available at Lee if he quit the Union. Sayio's initial attempt to withdraw was unsuccessful, so he visited Hom at Lee's plant. Sayio testified that Hom suggested he should send a telegram to the Union, gave him the Western Union telephone number, and lent him Lee's telephone. A few days later he returned to Lee, where Young and Ford asked him whether he had withdrawn. When he responded that he had, he was given work. Hom admitted that he told Sayio to send a telegram, but could not recall whether Sayio then placed the call. The administrative law judge found that although Hom was otherwise a meticulous witness, respecting this particular incident he was "less than impressive". Accordingly, the judge found that Hom had done "precisely what Sayio attributed to him".

Based upon the foregoing incidents, the Board found that respondents had engaged in conduct violative of section 8(a)(1) of the Act. In contesting this finding, respondents focus on the conduct of Mabel Ford. They argue that there is no evidence that Ford was acting on behalf of the company when she circulated the decertification petition, that her actions were entirely independent and voluntary. They point out that Ford had been both supervisor and union shop steward for years without any complaint by the Union. They submit that her

actions cannot be attributed to the company and the company cannot be said to have solicited withdrawal from the Union. Moreover, they argue, this incident occurred so far in advance of the strike and closing of Triumph that it is "remote and immaterial" to the issues here. Notably, respondents do not discuss or contest the judge's findings regarding the testimony of Wan, King, and Sayio, and the admissions of Hom concerning the employees' forced withdrawals from the Union in exchange for work at Lee, (or Triumph in Wan's case).

■ Employer activities which are calculated to erode employee support for the union violate section 8(a)(1). *NLRB v. Deutsch Co.,* 445 F.2d 902, 906 (9 Cir. 1971), *cert. denied* 405 U.S. 988, 92 S.Ct. 1248, 31 L.Ed.2d 454 (1972).[5] It is unlawful under section 8(a)(1) "for an employer to instigate and promote a decertification proceeding or induce employees to sign any form of union-repudiating document, particularly where the solicitation is strengthened by express or implied threats of reprisal or promises of economic benefit". *NLRB v. Sky Wolf Sales,* 470 F.2d 827, 829 (9 Cir. 1972) (quoting *NLRB v. Birmingham Publishing Co.,* 262 F.2d 2, 7 (5 Cir. 1958)).[6]

■ Even if we were to agree with respondents and discount Ford's initial activities in circulating a decertification petition, there is still substantial, uncontroverted evidence to support the Board's finding of a violation of section 8(a)(1). Young, Hom, and Ford admitted to talking to striking Triumph employees and offering them jobs if they would withdraw from the Union. Hom acknowledged that he advised King and Sayio to send telegrams to withdraw

---

**5.** In *Deutsch,* the company's president had sent a letter to the employees affording them an opportunity, by way of enclosed postcards, to "withdraw" their union authorization cards and stating that the relationship then existing was much better than the promises being made by the union organizers.

**6.** In *Sky Wolf Sales,* the employer's general manager, two non-union salesmen, and a ware-

house foreman had assisted in circulating a decertification proceeding. The court found substantial evidence that the activities of the salesmen and warehouse foreman were attributable to the employer, but that in any event the findings with respect to the general manager, "standing alone", was enough to sustain the Board's decision and order.

and lent King Lee's telephone to place the call. These incidents represent the type of promises of economic benefit and employer assistance to secure union repudiation which are prohibited by the Act.

■ Moreover, we are not inclined to overturn the Board's findings with respect to Ford's circulating a decertification petition. From our examination of the record we conclude that the judge was properly skeptical of Ford's testimony regarding this incident. Although respondents contend that she acted on her own, an employer may still be liable in situations such as this if other "employees would have just cause to believe [she] was acting for and on behalf of the company". *NLRB v. Texas Independent Oil Co.,* 232 F.2d 447, 450 (9 Cir. 1956). As a company supervisor, sufficient indicia of authority attached to her statements to suggest that other employees could well have believed she spoke for Triumph. Her actions constitute an additional basis for finding a section 8(a)(1) violation.

B. *Violation of Section 8(a)(5)*

Section 8(a)(5) of the Act provides that it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees . . ." 29 U.S.C. § 158(a)(5). Collective bargaining "is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." 29 U.S.C. § 158(d).

■ Whether the parties have the requisite good faith is a factual matter initially for the Board to decide and the Board has been afforded flexibility to determine whether the "conduct at the bargaining table evidences a real desire to come into agreement". *NLRB v. Insurance Agents' International Union,* 361 U.S. 477, 498, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960). The Board may make this determination by "drawing inferences from the conduct of the parties as a whole". *Id.* See generally Cox, "The Duty to Bargain in Good Faith," 71 Harv.L.Rev. 1401, 1418 (1958). And where those inferences are reasonably drawn from substantial evidence in the record as a whole we are required to sustain the Board's findings. See *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1950). Here, the Board, by adopting the findings of the administrative law judge, determined that (1) Andrews' conduct in ordering the installation of pressing equipment at Lee while he was ostensibly negotiating with the Union, (2) the concomitant closing of Triumph and opening of a pressing division at Lee, utilizing Triumph equipment, employees, and supervisors, and (3) the questionable credibility of Andrews' explanation of these events, taken together, established Triumph's absence of good faith.

■ We find substantial evidence to support each of the findings. The judge first found that coincident with the start of collective bargaining, Andrews and Triumph "took major steps to in effect runaway" from Triumph's pressing plant and shift the pressing operation to Lee's Mission Street plant. The judge concluded that Triumph's negotiations with the Union were a "sham" and that the strikers were unfair labor practice strikers protesting the bad faith bargaining of their employer.

The judge noted specifically the testimony of Charles Catallo that Andrews had contacted him in January to order a boiler and steam irons for the Lee plant; that they discussed the size of the boiler and Andrews told Catallo that he would need sufficient capacity to serve other steam equipment Andrews already had; and that Andrews asked Catallo to install this other equipment. Catallo agreed to do so, but was delayed by other commitments until April, after the Triumph employees had begun their strike. Catallo inspected the equipment at Triumph's plant, but advised Andrews he could not move it because his employees would not cross the picket line. Andrews said he would take care of moving the equipment. Although Catallo did not install the equipment, on subsequent visits

to the Lee plant he recognized some of the equipment he had inspected at Triumph's plant. This testimony was corroborated by Lee employees who had previously worked at Triumph.

These steps taken by Andrews to develop a pressing operation at Lee, utilizing equipment from Triumph's plant, combined with evidence that Lee's pressing operation was an alter ego of Triumph, convinced the Board that Triumph had not bargained with the Union in good faith. After he had shifted Triumph's pressing operation to Lee, Andrews was able to shut down Triumph and evade his responsibility to negotiate with the Union by refusing to allow Triumph employees to work at Lee until they withdrew from the Union.

Respondents contend that there were independent business reasons for developing the pressing division at Lee which were unrelated to the strike and closing of Triumph. They claim that Andrews had acquired a new customer who wanted to have all production steps at the same location to ensure quality control of a new line of garments. Under his contract with this customer Andrews was unable to pay union rates for pressing the garments. They acknowledge that Triumph began pressing this new line of garments before the Strike, but assert that this was only a temporary measure which Andrews chose to take at a loss while he waited for Catallo to install the pressing equipment at Lee.

Regarding the concomitant closing of Triumph, respondents put forth a number of business considerations which, they claim, led Andrews to discontinue operations. Andrews testified that his landlord had advised him by phone and written memorandum that his lease would not be renewed,[7]

and that Union actions had caused him to lose all of his customers. The Union had picketed, or threatened to picket, each of his three major customers, and they responded by refusing to send any more work to Triumph.

Respondents further contest the finding that their bargaining was a "sham". They claim that it was the Union's intransigence over the clauses which would permit the Union to organize Triumph's customers which prevented agreement; that Triumph had valid, good faith business reasons for wanting those clauses removed from the contract. All of Triumph's customers were non-union and incorporation of those clauses would threaten Triumph's future relationships with those customers.[8] Respondents submit that the Union never offered any meaningful alternatives to the objectionable clauses. Thus, they argue, the Board erred in attributing bad faith to their conduct at the bargaining table.

While respondents' characterization of these events is not entirely implausible, we find substantial evidence on the record as a whole to support the Board's contrary findings. The general manager of Triumph's landlord testified that no one in his office contacted Andrews price to June, 1974, and that there had been no cancellation of the lease. He had no direct contact with Andrews until September when Andrews called to inquire about leasing the building for another of his garment businesses. If Andrews had closed Triumph because he had been forced out due to loss of his lease, it seems unlikely that he would attempt to secure another lease on the same premises just a few months later. Respondents' explanation of the coincidental closing of Triumph and opening of a pressing division at

---

7. Andrews testified that he had lost the memorandum, so he could not produce it at the hearing.

8. These clauses were, of course, in the expired contract. Although Triumph had non-union customers throughout the period of the contract, the Union made no attempt to organize those customers. Andrews insisted that his business had changed since the execution of the prior contract, but his testimony became

quite hazy when he was asked *how* it had changed. He said that he had become primarily a general contractor in that interim, dealing with non-union customers, but he admitted that all of his customers had been non-union since before the execution of the contract. He also had difficulty recalling the substance of the critical clauses and what was objectionable about them.

Lee is similarly suspect. While it may well be true that the unionization of Triumph made business more difficult for Andrews,[9] he may not cure that difficulty by relocating and reopening the same business elsewhere without the Union. Respondents offer no explanation for Andrews' statements to Catallo in January (three months before Triumph closed) that he wanted to remove some of Triumph's equipment and reinstall it at Lee.

With regard to respondents' charges of Union intransigence, it suffices to note that the Union was not seeking new contractual provisions. Rather it was Triumph which sought to excise language from the prior agreement. Andrews claimed this was necessary because his business had changed in the interim. The record indicates, however, that all of his customers were non-union long before he entered into the prior bargaining agreement. Moreover, there was testimony that these clauses are standard in agreements of this type; Mattie Jackson testified without contradiction that she had never encountered an agreement without them. She also testified that the Union was cognizant of Andrews' difficulties with those clauses and offered to execute a side letter stating that the Union would not attempt to utilize them to organize certain designated customers of Andrews. The company rejected the side letter and resisted all attempts to include the clauses in the agreement itself.

■ The statutory obligation to bargain requires the parties "to enter into discussion with an open and fair mind and a sincere purpose to find a basis of agreement . . . ." *NLRB v. Holmes Tuttle Broadway Ford Inc.*, 465 F.2d 717, 719 (9 Cir. 1972) (quoting *NLRB v. Herman Sausage Co.*, 275 F.2d 229, 231 (5 Cir. 1960)). Section 8(a)(5) does not require a party to "make concessions or yield any position fairly maintained". *Holmes Tuttle*, 465 F.2d at 719. But, it *does require good faith* in asserting one's position.

Respondents rely upon *Textile Workers Union v. Darlington Manufacturing Co.*, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), to argue that an employer has "an absolute right to shut down all or part of its business permanently even for anti-union considerations," and there can be no violation of the Act here because the Board "failed to prove that the closing of Triumph was motivated by a purpose of 'chilling unionism elsewhere' ". Their reliance upon *Darlington*, however, is misplaced. First, the Supreme Court in *Darlington* distinguished between the "runaway shop" cases, where the employer transfers its work to another plant or relocates elsewhere, and cases where there is a complete shutdown and termination of the employer-employee relationship. In the latter cases there is no future economic benefit to the employer, whereas the "runaway shop" and "temporary closing" cases afford the employer leverage for discouraging the remaining employees from exercising their statutory right to concerted activity. *Id.* at 272–75, 85 S.Ct. 994. The other cases cited by respondents involve a complete shutdown. See, *e. g., A. C. Rochat Co.*, 163 NLRB 421 (1967). Here, however, we are faced with a "runaway shop" situation. We have concluded that the Board properly found respondents to be an integrated enterprise and joint employer. The closing of Triumph and opening of Lee's pressing division must be viewed as a relocation of the same business. "While it is now clear that an employer may terminate his business for any reason, it is equally well settled that he may not transfer its situs to deprive his employees of rights protected by [the Act]." *Local 57, ILGWU v. NLRB*, 126 U.S.App.D.C. 81, 84, 374 F.2d 295, 298 (1967), *cert. denied*, 395 U.S. 980, 89 S.Ct. 2129, 23 L.Ed.2d 767 (1969).

■ Second, with regard to the absence of Board findings that the relocation was motivated by a desire to chill unionism, we

---

9. It is difficult to untangle the entwined business considerations and possible anti-union animus. Despite his claimed good faith in bargaining, we note that Andrews admitted telling a union organizer that he was no longer going to "put up with the Union" as he had in the past.

note that in *Darlington* the Court was reviewing a section 8(a)(3) violation and not, as here, a section 8(a)(5) violation. Section 8(a)(3) prohibits an employer·"by discrimination . . . to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3). The Supreme Court has held that "the employer's *purpose* in discriminating" is controlling in a section 8(a)(3) case. *Radio Officers' Union v. NLRB*, 347 U.S. 17, 44, 74 S.Ct. 323, 98 L.Ed. 455 (1954). (emphasis added). Without a finding of anti-union motive there is no unfair labor practice unless the conduct was so inherently destructive of employee rights that the unavoidable and foreseeable consequences of the employer's conduct bear their own indicia of motive. See, *e. g., NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 228, 231, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). But where the adverse impact of employer conduct is less substantial and the employer·comes forward with business considerations which allegedly motivated the questioned conduct, then an affirmative showing of anti-union purpose must be made to support a section 8(a)(3) charge. *NLRB v. Great Dane Trailers*, 388 U.S. 26, 33–34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). See generally Christiansen & Svanoe, "Motive and Intent in the Commission of Unfair Labor Practices: The Supreme Court and the Fictive Formality," 77 Yale L.J. 1269 (1968).

 A motive to chill unionism, however, is not an element of a section 8(a)(5) unfair labor practice. In a "runaway shop"

case, where the employer has been charged with violating section 8(a)(5), it is his evasion of his duty to bargain collectively by refusing to recognize and negotiate with the Union at his new location which is critical. Since Lee's pressing division was an alter ego of Triumph, the respondents had a continuing duty to recognize the Union as the representative of its pressing employees at Lee. See, *e. g. NLRB v. Die Supply Co.*, 393 F.2d 462, 467 (1 Cir. 1968); [10] *NLRB v. Lewis*, 246 F.2d 886, 888–89 (9 Cir. 1957). Instead, respondents dealt with the employees individually and compelled their renunciation of the Union in order to return to work.

 The business considerations which respondents claim motivated the closing of Triumph and opening of Lee's pressing division do not warrant overturning the Board's finding of a section 8(a)(5) violation. There is substantial evidence to support the Board's finding that respondents' conduct demonstrated an absence of good faith during the bargaining. It is clear that respondents refused to recognize the Union after the transfer of the pressing operations from Triumph to Lee. This refusal, standing alone, is an unfair labor practice under 8(a)(5). See *NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).[11]

### III.

### The Bargaining Order

The Board ordered respondents, *inter alia*, to cease and desist from refusing to

---

**10.** In *Die Supply Corp.*, the employer closed down its plant at one location and moved without notice to the union to a new location, where it dealt with its former employees, offering many of them jobs, but not as union members. In affirming the Board's finding of a violation of section 8(a)(5) and (1) of the Act, the court held that the employer had an obligation to notify the union and bargain with it with reference to transfer of employees and other effects of the move. 393 F.2d at 467–68.

**11.** In a plant relocation or closing case, the employer also has a duty to notify the Union of its decision and negotiate with the Union about the effect of the closing or relocation upon "the rights of the employees whose status will be altered by the managerial decision". *NLRB v.*

*Transmarine Navigation Corp.*, 380 F.2d 933, 939 (9 Cir. 1967); accord *Fraser & Johnston Co. v. NLRB*, 469 F.2d 1259, 1263 (9 Cir. 1972). It is unclear whether the parties attempted to negotiate about the effects of the closing. Hom testified that after the closing he offered to negotiate with the Union, but that the Union never followed up on his offer. Admitted into evidence, however, was a subsequent letter from Jackson to Hom requesting negotiations. That letter was apparently not delivered by the postal service because it was addressed to Hom at the closed Triumph plant. Jackson testified she tried to have it hand delivered, but then decided to bring the unfair labor practice charges without further delay.

recognize the Union as the representative of Lee's pressing employees and to bargain, upon request, with the Union and to sign any agreement reached. Respondents contend that enforcement of the order should be denied because of the "undisputed evidence of violence" on the part of the strikers. They rely primarily on the policy of the Board announced in *Laura Modes Co.*, 144 NLRB 1592 (1963), that where a union evidences total disinterest in enforcing its rights through the peaceful legal process provided by the Act and instead resorts to violence, the Board will refuse to issue a bargaining order, even though the employer has violated the Act.[12]

It is true, as respondents argue, that the administrative law judge in his findings did not analyze and discuss the acts of violence of union members. We cannot agree with respondents, however, that they were not considered by the judge and the Board. The findings and conclusions of the judge read in part:

> Respondents have argued vigorously and adduced considerable testimony, countered by the Charging Party, concerning purported strike misconduct. It is urged that the Board therefore withhold a bargaining order under the authority of *Laura Modes*, 144 NLRB 1952. I note additional authority in *Allen Distributors*, 201 NLRB 417, where six union agents attempted to forcibly procure the withdrawal of a decertification petition.

> The Charging Party has directed attention to *Fairview Hall Convalescent Hospital*, 206 NLRB No. 108, where the Board reversed a recommendation that a bargaining order be withheld. It relied upon

the fact that the conduct occurred sporadically during a 4-month long strike, involved a small proportion of strikers, and took place against a background of frequent and recurring unfair labor practices. Surely, in the present case, Respondents' unfair labor practices go beyond that as they were constant.

It is noteworthy that all allegations of misconduct took place during the first month of the strike, which has lasted for over 1 year and is still continuing. Indeed, the last alleged incident late in April took place while Respondent was still in the process of running away from Triumph to Lee and ultimately shut down Triumph on May 8, 1974. Needless to say, this early conduct did take place in the early days of a heated strike. For a case involving similar conduct in an election context, see *N. L. R. B. v. Bostick Division, USM Corporation*, 89 LRRM 2585 [517 F.2d 971] (C.A.6). In perspective, while not condoning these alleged incidents, I think that the equities balance in favor of not applying *Laura Modes* herein.[13]

▮▮▮▮ In determining the propriety of a bargaining order, both the Board and the courts have followed a balancing approach—comparing the unfair labor practices of the employer with the misconduct of the union. Most of the cases, like *Laura Modes*, have involved union recognition. A bargaining order is appropriate where the unfair labor practices are of such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, or in "less pervasive practices which nonetheless still have the tendency to un-

12. In *Laura Modes*, union representatives were seeking recognition. The Board decided that in view of their "violent tactics", the "legitimate interests of the public and the parties will best be served by denying the Union the right to invoke our statutory processes in aid of a demand for recognition as bargaining representatives of Respondents' employees unless and until it demonstrates its majority among those employees through the Board's election processes". 144 NLRB at 1596.

13. In a footnote, the judge stated further:

Certain conduct, such as threatening to throw acid apparently not in his possession in the face of Irene Andrews, was attributed to former organizer Richard Sorro, now working for an affirmative action office for the Mayor of San Francisco, although initially her testimony was that it was said by two others in his presence. He was also accused of setting a fire in a trash can beside the building and kicking on a rear door. Although he was a most unimpressive witness whose denials I do not credit, I still adhere, on balance, to the views set forth above.

dermine majority strength and impede the election processes". *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969). On the other hand, where it is union misconduct which obstructs the employees' right to determine whether they want the union to represent them, no bargaining order should be enforced. *NLRB v. World Carpets Inc.*, 463 F.2d 57, 62 (2 Cir. 1972); *Cf. NLRB v. United Mineral & Chemical Corp.*, 391 F.2d 829 (2 Cir. 1968). In *Donovan v. NLRB*, 520 F.2d 1316 (2 Cir. 1975), *cert. denied* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976), the court noted the difficulty of fashioning an appropriate remedy where both sides are guilty of misconduct, *id.* at 1323, and recognized the duty of the Board to "measur[e] the effect of the Company's violations against the gravity of the Union's misconduct in deciding whether a bargaining order was appropriate". *Id.* at 1321.

■ As noted *supra*, the cases upon which respondents rely have arisen in the context of a union's campaign to gain initial recognition as the employees' representative. Enforcement is denied to prevent the union from profiting from its own misconduct and avoiding the need to obtain a majority in a representation election. We have found no cases where, as here, the union represented the employees at one location of an integrated enterprise, but was refused recognition as representative of the same employees at another location. We believe, however, that an analogous comparative approach is appropriate. Denial of a bargaining order would compel the Union to demonstrate that a majority of Lee's pressing employees still desire representation, but denial is only appropriate if respondents were less "guilty" and it was the Union's conduct which engendered a coercive atmosphere. See *Donovan supra*, 520 F.2d at 1321–23.

■ There is no question that during the first month of a heated strike both sides were guilty of serious misconduct. Respondents argue that "the Union has engaged in, among other things violence, arson, assault and battery on employees and supervisors, mass picketing, breaking and entering, and destruction of property". Respondents note that the original unfair labor practice complaint issued against the Union alleged 16 separate acts of unlawful conduct on the part of the Union, its agents and pickets. They point to instances of verbal threats against Andrews and his wife and against non-union persons who went to Triumph to help Andrews finish Triumph's work. They cite numerous instances of pickets blocking ingress and egress to the Triumph plant and decry the actions of union organizers and employees allegedly puncturing tires and tailing non-strikers' cars, and allegedly breaking and entering, and starting a fire in a trash can.

We agree with respondents that violent Union misconduct should not be condoned and we do not in any way condone or downplay the misconduct which undoubtedly occurred in the initial heat of the Triumph strike. It does appear from the record, however, and also from respondents' own description of the Union's misconduct that most of the egregious incidents centered around the conduct of one union organizer, Richard Sorro (see comment of the administrative law judge set out in note 13). Although there were extremes of verbal abuse and serious threats of physical violence, there was apparently no actual violence against any persons as grievous as found in those cases wherein enforcement of a bargaining order was denied. See, *e. g., United Mineral & Chemical Corp.*, 391 F.2d at 839–40.[14] The record also indicates that strike and picket line misconduct was not confined to the Union.[15]

14. In *United Mineral & Chemical*, a picket line mob attacked the owner causing physical incapacitation for over five months. In *World Carpets,* union persons on the picket line carried baseball bats and other objects to threaten nonstrikers and one union organizer was charged with criminal assault. 463 F.2d at 58–60.

15. The Board notes that respondents also allegedly engaged in picket line misconduct, including putting a horseshoe studded with nails under a Union car, and backing a car into some pickets. This was disputed by respondents. The Board notes also that the Union obtained a restraining order against Triumph, Triumph ap-

It is clear that the Union misconduct was confined to the first month of the strike. No violence occurred after the picket line moved to Lee, even though it continued in effect for at least another year. In *Donovan,* union misconduct was similar to that found in this case. The court recognized, as we do here, that the union excesses were unwarranted and illegal, but noted that the misconduct, as here, involved only a handful of employees and was limited to the early stages of the strike. Recognizing that the denial of a bargaining order is an "extraordinary sanction", the court deferred to the "Board's approach in refusing to view individual incidents apart from their larger framework, and its ultimate resolution of the mixed question whether the Union's activities on the whole were of a kind that should preclude a bargaining order". 520 F.2d at 1323.

Most important, in this case respondents did pursue normal remedial measures for the misconduct of the Union by filing an unfair labor practices charge which resulted in the issuance of a section 8(b)(1)(A) complaint against the Union. The Union then entered a settlement agreement—containing a non-admission clause—and no further violence or misconduct occurred. The Union thus respected its commitment to peaceful conduct and the prior misconduct was treated in accordance with appropriate statutory remedies. As such, the "Union's demonstrated good faith in submitting to the legal process" supports the Board's issuance of a bargaining order. *Id.*

In comparison, the respondents' unfair labor practices clearly undermined the strength of the Union. They engaged in surface negotiations, while taking steps to relocate and "run away" from their obligation to recognize and bargain with the Union. They also coercively assisted employees in renouncing their Union membership in exchange for the economic benefit of a job. Under these circumstances it is likely the employer's conduct would have made a free and fair election impossible, and a bar-

gaining order is appropriate without first requiring the Union to show it has been able to maintain its majority status. See *Gissel,* 395 U.S. at 610, 89 S.Ct. 1918; *Donovan,* 520 F.2d at 1323. The employer should not be permitted to profit from his wrongful refusal to bargain. *Gissel,* 395 U.S. at 610, 89 S.Ct. 1918.

A denial of a bargaining order would not result, as in *Laura Modes,* in a return to the *status quo ante*—that is, no union—and force the Union to show anew that the majority of the employees desired representation. As noted *supra, Laura Modes* and other cases upon which respondents rely involved initial recognition of a union. In this case, however, the Union was the acknowledged representative of the employees at one location of an integrated enterprise engaged in collective bargaining in an attempt to reach a new contract. The employer was simultaneously engaged in "sham" bargaining and making plans to "run away" from its obligation to bargain with the authorized representative of the employees by relocating its business. As the Supreme Court held in *Gissel,* "perhaps the only fair way to effectuate employee rights is to *re-establish the conditions as they existed before* the employer's unlawful campaign". 395 U.S. at 612, 89 S.Ct. at 1939 (emphasis added). Re-establishment here can most nearly be attained by enforcement of the order.

While more specific findings with respect to the misconduct of the union representatives would have been desirable, it is clear that the administrative law judge did in fact consider the *Laura Modes* doctrine and found that "the equities balance in favor of not applying *Laura Modes* herein". Viewing the record as a whole we are not persuaded that the Board did not give adequate consideration to the evidence of union misconduct, and we defer to its judgment. The Supreme Court in *Gissel* made it clear that "It is for the Board and not the courts, however, to [determine whether a bargaining order is appropriate], based on its ex-

plied for a preliminary injunction, and the California Superior Court for the City of San Fran-

cisco entered cross injunctions against both parties with respect to picket line misconduct.

pert estimate as to the effects on the election process of unfair labor practices of varying intensity." 395 U.S. at 612, n. 32, 89 S.Ct. at 1939.

Particularly in view of the fact that the initial misconduct of the Union was effectively remedied through normal legal procedures, we conclude that the bargaining order should be enforced. If the employees subsequently desire to disavow union representation they may initiate decertification procedures. The effect of enforcement here is merely to permit the re-institution of a pre-existing bargaining relationship which " 'must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed', after which the 'Board may, . . . upon a proper showing, take steps in recognition of changed situations which might make appropriate changed bargaining relationships.' " *Gissel,* 395 U.S. at 613, 89 S.Ct. at 1939 (quoting *Franks Bros. Co. v. NLRB,* 321 U.S. 702, 705–06, 64 S.Ct. 817, 88 L.Ed. 1020 (1944). Similarly, if respondents entertain good faith doubts about the continued vitality of the Union's majority, their proper recourse is by way of petition to the Board. *NLRB v. Die Supply Corp.,* 393 F.2d 462, 467–68 (1 Cir. 1968).

### Conclusion

We find substantial evidence on the record as a whole to support the Board's decision and order in all respects. Accordingly the Board's petition for enforcement of its order is granted.

HUFSTEDLER, Circuit Judge, concurring and dissenting:

I concur with the majority opinion, except in the enforcement of the bargaining order. I would remand that issue to the Board for the purpose of making findings of fact on the charges of serious violence by the union during the strike, and on whether, if such violence was found to have occurred, it had any coercive effect upon the employees in the exercise of their free choice. Thereafter, the Board should reconsider its bargaining order in the light of the

analysis of the effect of union violence on the propriety of a bargaining order developed in *Laura Modes Co.* (1963) 144 N.L. R.B. 1592, and *N. L. R. B. v. United Mineral & Chemical Corp.* (2d Cir. 1968) 391 F.2d 829, 838–41.

Neither the administrative law judge nor the Board gave more than casual attention to respondents' charges that the union had committed a series of grave offenses early in the strike. Those charges included attempted arson on the Triumph plant, assault and battery on non-striking employees and supervisors, attempted assault on one of the respondents, breaking and entering, destruction of respondents' property, threats to kill, threats to throw acid in the face of the wife of one of the respondents, and threats to harm the child of one of the respondents. The Board has admitted that certain violent episodes took place but has sought to minimize their seriousness and significance. The administrative law judge made no findings specifically directed toward respondents' charges other than to observe that the violent incidents took place early in the strike and that respondents' conduct was also not above reproach.

The failure of the Board to focus its attention upon the claim of serious union violence appears to derive from the assumption that the denial of a bargaining order is primarily a punitive measure designed to deter the union from future misconduct and to induce the union to comply, in good faith, with the legal process instead of resorting to violent self-help. If the *Laura Modes* doctrine requiring that bargaining orders be denied in cases of serious union violence rested solely on that rationale, I would agree with the Board that it was unnecessary to examine further the underlying charges of violence because both deterrence and evidence of reformation existed in this case after the Board brought its Section 8(b)(1)(A) proceeding against the union, which was thereafter settled. The rationale of *Laura Modes,* however, has an important different aspect, which mandates an inquiry into the effect of serious violence upon the present and prospective members of the union.

The denial of a bargaining order in a situation marked by union violence is not simply a sanction directed against the union. More significantly, it is a vindication of employee rights, because violence, whether initiated by the employer or the union, and whether directed against the employer, non-striking workers, unionists, or outsiders, can inject an element of coercion and intimidation into the relationship between a union and its members which is incompatible with the principle of employee free choice, the keystone of the structure of representation and bargaining established by our national labor legislation. Violent conduct on the part of the union can make the membership fearful of exercising their rights to seek to end a strike or to change their union representation because even when the violence is not directed against employees it may suggest to them that the union is willing to resort to force in resolving disputes in the future.

The place to begin the analysis is the *Laura Modes* case. The union had received the unanimous support of the employees in the bargaining unit, as determined by the employees' signing authorization cards. In response to the demand for recognition and negotiation by the union, the employers called a meeting of employees, at which they denounced the union, requested employees to withdraw from it, declared that they would never negotiate with the union, and that they would drastically cut back the size of the work force if unionization occurred. Early in the dispute, two violent episodes took place in which one employer-partner was struck in the face by a union man and another partner was beaten up. The employers filed charges with the Board, alleging union violations of Section 8(b)(1)(A). As in our case, the complaint in *Laura Modes* was later withdrawn after the regional director reached a settlement agreement with the union, wherein the union pledged to refrain from committing further violent acts.

The Board refused to issue the bargaining order because (1) the union deliberately bypassed the statutory procedures designed to test its representation claim and to enforce its bargaining rights; and (2) union violence, whether or not directed solely at management, creates a coercive atmosphere which may taint the representation process by putting the employees in fear.[1] The Board recognized that union violence could create "[a]n atmosphere of violence and intimidation" and could be destructive of employee free choice. The potential for employee intimidation from union directed violence is every bit as great whether, as here, the union's representative status had been determined before the violence occurred or whether, as in *N. L. R. B. v. World Carpets of New York, Inc.* (2d Cir. 1972) 463 F.2d 57, 62, the violence was a concomitant of a representation struggle. (*See also Allou Distributors, Inc.* (1973) 201 N.L.R.B. 47, 48 (violence by union which had been certified as bargaining representative found to constitute a "callous attempt to enforce its representation rights"; bargaining order withheld); *Donelson Packing Co., Inc.* (1975) 220 N.L.R.B. 1043 (examining the "lingering effects" of union misconduct and concluding that the infection had sufficiently "subsided" to warrant a bargaining order).)

As I read *Laura Modes*, a *prima facie* showing of employee intimidation is made upon proof that the union committed serious acts of violence. Absent a showing by the union that the coercive effects of its misconduct have been dissipated, the union can no longer be considered the freely-chosen representative of the bargaining unit. Under such circumstances, the issuance of a bargaining order is inappropriate.

Moreover, this understanding of why a bargaining order is denied under circumstances of union violence necessarily affects the process by which we determine whether to withhold a bargaining order in a particu-

---

1. "We recognize that the employees' right to choose the Union as their representative survives the Union's misconduct. But we believe it will not prejudice the employees un- duly to ask that they demonstrate their desires anew in an atmosphere free of any possible trace of coercion." (144 N.L.R.B. at 1596.)

lar case. If our only concern were the appropriate punishment for an erring union, I would agree that in deciding whether to apply *Laura Modes* it is proper to balance union misconduct against employer unfair labor practices. But this kind of balancing is beside the point when the real issue is the impact of union violence upon the employees' continued support of the union. (*See, e. ·g., N. L. ·R. B. v. United Mineral & Chemical Corp.* (2d Cir. 1968) 391 F.2d 829, 841.) As the Board has observed, "misdeeds by competing parties do not erase or neutralize each other"; rather, an employer's misconduct "compounds rather than nullifies" the union's bad behavior. (*Donelson Packing Co., Inc., supra,* 220 N.L.R.B. at 1060.) Thus, if *Laura Modes* is distinguishable it cannot be because the employer's misconduct was somehow "more serious" than the union's, but because the union's violence was not serious enough to intimidate or coerce employees with respect to their relationship with the union.

That may ultimately prove to be the case here, but such a determination cannot be made upon the present record. Neither the administrative law judge nor the Board made adequate findings on the violence issue. The General Counsel would minimize the significance of the acts which admittedly occurred by a gentle reading of the record in the union's favor (*cf. N. L. R. B. v. United Mineral & Chemical Corp., supra,* 391 F.2d at 838–41); but the fact that the union did not carry out its threat to kill or to maim and that the alleged arson attempt was unsuccessful does not resolve the issue. Threats of death and personal injury may have been perceived by the employees as simply emotional outbursts in the heat of battle, but under all of the circumstances, .the employees may have taken them seriously and been fearful that the union was "engaged in a deliberate plan of intimidation and violence" in order to obtain the ends it sought. (*Allou Distributors, Inc., supra,* 201 N.L.R.B. at 48.)

2. In the event that such an inquiry would prove to be too difficult or too costly, the Board could forego the bargaining order and test employee sentiment through a new election. *See, e. g., Chico Convalescent Hospital* (1974) 210 N.L.

I would remand to the Board for findings on the acts of violence charged and the effect, if any, upon the employees' freely-given acceptance of the union as their bargaining representative.[2]

R.B. 547, 552, *enforced sub nom N. L. R. B. v. Dent* (9th Cir. 1976) 534 F.2d 844; *Laura Modes Co., supra,* 144 N.L.R.B. at 1596; *N. L. R. B. v. United Mineral & Chemical Corp., supra,* 391 F.2d at 841.