GREAT CHINESE AMERICAN SEWING COMPANY, Esprit de Corp., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

SAN FRANCISCO JOINT BOARD, INTERNATIONAL LADIES' GARMENT WORKERS' UNION, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 77–1299, 77–1722.

United States Court of Appeals, Ninth Circuit.

July 10, 1978.

J. Mark Montobbio of Severson, Werson, Berke & Melchior, San Francisco, Cal., for petitioners.

Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., for respondent.

Before BROWNING, KENNEDY and HUG, Circuit Judges.

PER CURIAM:

The San Francisco Board of the International Ladies' Garment Workers Union, AFL–CIO (Union), attempted to organize the Great Chinese American Sewing Company (GCA), a subsidiary of Esprit de Corp. (Esprit). On July 4, 1974, Frankie Ma, an employee of GCA, began distributing Union authorization cards to his fellow workers. By July 12, over two thirds of GCA's employees had signed such cards.

On July 9, Ma was discharged. On the morning of July 12, Doug Tompkins, president of Esprit, spoke to the assembled employees of GCA. He promised the workers a wage increase if they rejected the Union and threatened to close GCA if they did not. That afternoon, while distributing pay checks, Handa Lai, GCA floor supervisor, interrogated the workers as to their Union sympathies. Lai told those she suspected of Union allegiance that they could not have their paychecks until they surrendered their Union cards. Lai announced that employees who had signed Union cards need not return to work on the following Monday, while those who had rejected the Union should report for work as usual.

The Union filed unfair labor practice charges against GCA and Esprit and struck GCA. The companies then closed GCA's plant and discharged all of GCA's workers. The few who had renounced the Union were reemployed by Esprit. The Union filed additional unfair labor practice charges against the companies.

The Board found GCA and Esprit were a single integrated enterprise, and that they had engaged in unfair labor practices. The Board ordered the companies to recognize and bargain with the Union, as the authorized representative of GCA's employees, and to pay discharged workers back pay. The Board declined to order Esprit to reopen the GCA plant.

The companies petitioned for review, challenging the Board's findings as unsupported by substantial evidence and challenging the Board's remedy as an abuse of discretion. The Union petitioned for review, asserting that the Board abused its discretion by failing to order reopening of the GCA plant. The Board cross-petitioned for enforcement. We dismiss both petitions for review and grant the Board's petition for enforcement.

■ Substantial evidence on the record as a whole supports the Board's finding that Esprit and GCA constituted a single integrated enterprise and Esprit was therefore responsible for unfair labor practices committed against GCA employees. Esprit is a designer and distributor of ladies' garments. It founded GCA in 1972 to do its sewing work. Throughout GCA's brief history, virtually all of its output went to Esprit. Esprit owned 90 percent of GCA. The remaining 10 percent belonged to Esprit's production manager. GCA and Esprit filed consolidated tax returns and financial statements. On July 1, 1974, Esprit suspended Mike Kozak, the president and general manager of GCA, and replaced him with a management team made up of Esprit officials. These Esprit officials directed GCA's subsequent anti-Union offensive.

■ The four criteria for determining the existence of an integrated enterprise—

interrelation of operations; common ownership or financial control; common management; and centralized control of labor relations, see *Radio Union v. Broadcast Service*, 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965); *NLRB v. Triumph Curing Center*, 571 F.2d 462, 468 (9th Cir. 1978)—have been met.

■ Substantial evidence on the record as a whole supports the Board's findings that the companies interfered with, restrained, and coerced the employees of GCA in their organizational efforts in violation of section 8(a)(1) of the National Labor Relations Act. Tompkins' threats and promises in his July 12 speech violated section 8(a)(1). *Hertzka & Knowles v. NLRB*, 503 F.2d 625, 628 (9th Cir. 1974). Handa Lai's coercive interrogation of employees later that same day also violated the Act, see *NLRB v. Deutsch Co.*, 445 F.2d 902, 904 (9th Cir. 1971), as did her demand for surrender of authorization cards, *NLRB v. Essex Wire Corp.*, 245 F.2d 589, 592 (9th Cir. 1957), and her threat to discharge Union adherents, *NLRB v. Sebastapol Apple Growers Union*, 269 F.2d 705, 708 (9th Cir. 1959).

■ The companies argue that Tompkins did not make the threats and promises attributed to him. Six employee witnesses testified otherwise. It is the function of the administrative law judge, "who observes the witnesses and hears their testimony, to determine credibility," *NLRB v. Carpenters Local 180*, 462 F.2d 1321, 1324 (9th Cir. 1972), and we will not disturb the administrative law judge's finding of fact. See *NLRB v. Ayer Lar Sanitarium*, 436 F.2d 45, 49 (9th Cir. 1970). Moreover, uncontested findings as to Handa Lai's conduct are sufficient to support the Board's determination.

■ Substantial evidence supports the Board's finding that Frankie Ma was discharged for his Union activities. Ma was the Union's most prominent supporter. He solicited 43 of the 67 Union authorization cards. His Union activities were known to management. The day before his dis-

charge, Handa Lai saw Ma give a Union card to another employee.

The Board was entitled to reject the companies' argument that Ma was discharged for unsatisfactory work rather than for his Union activities. Ma testified, without contradiction, that he had been employed by GCA for two years, had received two or three pay raises, and had never been criticized for poor work. A few days before his discharge, Ma was described by the head of Esprit's management team as a "good guy." Management never told Ma that his work was unsatisfactory or that he was in danger of discharge. Finally, at the time of his discharge, Ma was told he was being laid off for lack of work, a justification the companies later admitted was false.

The Board was also entitled to reject the argument that Ma was discharged for spreading false rumors concerning Kozak's suspension. Again, the lack of warning and the probably false explanation given to Ma at the time of discharge argue against this theory. See *Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466, 470 (9th Cir. 1966). In addition, Kozak was in the plant talking to workers at the time Ma was alleged to have spread the false rumors. It is unlikely Ma would have lied about Kozak in Kozak's presence.

■ Substantial evidence supports the Board's finding that Esprit closed GCA's plant because of anti-Union animus rather than because GCA was unprofitable, as Esprit suggests. When it assumed control of GCA in July of 1974, Esprit planned to reorganize and renovate GCA. Immediately prior to the strike, Tompkins promised GCA employees a pay raise, but threatened to close the plant in the event of unionization. These actions are inconsistent with Esprit's contention that its decision to close GCA was made for business reasons independent of anti-Union animus.

■ An employer may terminate his business for anti-Union reasons without violating section 8(a)(3), but a partial closing to chill unionism in other parts of the employer's operations is unlawful. *Textile*

*Workers Union v. Darlington Co.*, 380 U.S. 263, 275, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). Similarly, an employer may not, as these companies did, close a part of their operations, discharge the employees involved, and subcontract the work for anti-Union purposes. *Id.* at 272 n.16, 85 S.Ct. 994. *NLRB v. Townhouse T.V. & Appliances, Inc.*, 531 F.2d 826, 828–29 (7th Cir. 1976); *NLRB v. George J. Roberts & Sons, Inc.*, 451 F.2d 941, 945–47 (2d Cir. 1971); *Tonkin Corp. v. NLRB*, 420 F.2d 495, 497–98 (9th Cir. 1969); see *NLRB v. Triumph Curing Center, supra*, 571 F.2d at 473 (alternate ground) (runaway shop). The fact that industry conditions may have changed after the closing, and might now provide a business justification for GCA's decision to subcontract abroad does not alter the fact that anti-Union animus motivated the closing and subcontracting when they occurred.

■ The Board's back pay order was proper. It is well settled that "[m]aking the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces," *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197, 61 S.Ct. 845, 854, 85 L.Ed. 1271 (1941), and that "[b]ack pay is one of the simpler and more explicitly authorized remedies utilized to attain this end." *NLRB v. Strong*, 393 U.S. 357, 359, 89 S.Ct. 541, 543, 21 L.Ed.2d 546 (1969). The Board did not abuse its discretion in ordering Esprit to pay GCA's former employees back pay from the time of their unlawful discharges until such time as they secured substantially equivalent employment with Esprit or elsewhere. Similar orders have been enforced in the past. See *Darlington Manufacturing Co. v. NLRB*, 397 F.2d 760, 773–74 (4th Cir. 1968) (en banc); *Local 57, ILGWU v. NLRB*, 126 U.S.App.D.C. 81, 86, 374 F.2d 295, 300 (1967).

■ The companies argue that the back pay order subjects them to unlimited back pay liability. We agree with the Board that questions relating to the exact amount of back pay owing (including whether discharged employees made reasonable efforts

to secure employment, and whether at some reasonably determinable date employment with GCA would not have been available because GCA operations would have ceased for independent, nondiscriminatory reasons) are prematurely raised in this enforcement petition. Those issues may be explored in a compliance proceeding. *See NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 411, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960) (Frankfurter, J., concurring); *NLRB v. Dazzo Products, Inc.*, 358 F.2d 136, 138 (2d Cir. 1966); *NLRB v. Theatrical Employees Local 776*, 303 F.2d 513, 521 (9th Cir. 1962).

■ The Board properly ordered the companies to bargain with the Union. The Union enjoyed majority support prior to the unfair labor practices. By destroying the bargaining unit, the unfair labor practices have made a fair election, or any election at all, impossible. The Board may issue a bargaining order in such circumstances. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 613–14, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

The Board did not abuse its discretion in rejecting the companies' argument that sporadic picket line violence during the early part of the strike precluded issuance of the bargaining order. The violence involved here was less than that involved in *NLRB v. Triumph Curing Center, supra*, 571 F.2d 462, in which we approved enforcement of a bargaining order in the face of a similar contention by the employer.

■ We cannot say that the Board abused its discretion in concluding that GCA's former employees would be adequately served by the Board's bargaining and back pay orders and that a reopening order would be unduly burdensome. *See Garwin Corp.*, 153 N.L.R.B. 664, 681 (1965), *aff'd in pertinent part, Local 57, ILGWU v. NLRB, supra*, 126 U.S.App.D.C. at 86 n.7, 374 F.2d at 300 n.7. GCA's plant has been dismantled and its equipment sold piecemeal. Reconstruction would be expensive. In addition, since the closing, the trend in the garment industry has been to subcontract sewing work to low cost foreign companies. To require Esprit to do its sewing

domestically, in the face of this trend, would put Esprit at a competitive disadvantage within its industry.

The Board's order will be enforced.