602 F.2d 1302
 102 L.R.R.M. (BNA) 2498, 87 Lab.Cas. P 11,628
 CA 79-3323 LOS ANGELES MARINE HARDWARE CO., a Division of
Mission Marine Associates, Inc., and California
Marine Hardware Co., a Division of
Mission Marine Associates,
Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 78-1907.
 United States Court of Appeals,
Ninth Circuit.
 May 2, 1979.
 
 Anthony T. Oliver, Jr. (argued), Parker, Milliken, Clark & O'Hara, Los Angeles, Cal., for petitioners.
 Elliott Moore, Michael Nicholson (argued), N. L. R. B., Washington, D. C., for respondent.
 On Petition to Review a Decision and Order of the National Labor Relations Board.
 Before WRIGHT and WALLACE, Circuit Judges, and TEMPLAR, Senior District Judge.*
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 Los Angeles Marine Hardware Co. (LA Marine) and California Marine Hardware Co. (Cal Marine), both[1] divisions of Mission Marine Associates (Mission) petition for review of a National Labor Relations Board (Board) order adopting the decision of the Administrative Law Judge (ALJ).
 
 
 2
 The order states, in part, that: (a) Mission, LA Marine and Cal Marine are employers and, collectively, constitute a single employing enterprise within the meaning of § 2(2) of the National Labor Relations Act (29 U.S.C. § 151, Et seq.); (b) they violated §§ 8(a)(1) and (5) and § 8(d) of the Act by repudiating the terms and conditions of a collective bargaining agreement (CBA or agreement) with the union;[2] and (c) they violated §§ 8(a)(1) and (3) by the resultant discharge and refusal to reinstate 23 employees. 235 N.L.R.B. No. 88 (1978).
 
 
 3
 We grant the Board's cross-appeal for enforcement.
 
 FACTS
 
 4
 Mission, a holding company, owned LA Marine, a separate corporation. In November 1976, Mission reorganized the corporations it held and made them operating divisions. One of those divisions, the Hardware Distribution Group, includes LA Marine and Cal Marine. It is headed by General Manager Richard Zajic, a vice-president of Mission.
 
 
 5
 Cal Marine was an inactive shell prior to March 1977. LA Marine's activities centered in two market areas, recreational sales and commercial fishing. Recreational sales represented more than 80% Of LA Marine's total sales by early 1977.
 
 
 6
 The bargaining relationship between LA Marine and the union dated back at least to 1956. LA Marine was the only Mission subsidiary to sign the collective bargaining agreement at issue.
 
 
 7
 Despite efficiency measures, LA Marine faced a sizable potential operating loss. In part, this was due to the high union wages it was paying. During the 1975 collective bargaining negotiations, Zajic, Mission's Hardware Group General Manager, attempted unsuccessfully to obtain economic relief from the union in the recreational sales area.
 
 
 8
 Zajic and Jack D. Cox, the union's Secretary-Treasurer, met several times during January and February, 1977. They discussed LA Marine's intention to relocate its San Pedro recreational sales operations. Zajic proposed a new contract for the relocation, but the union declined to discuss the matter further in light of the existing agreement.
 
 
 9
 Zajic announced Mission's decision to move LA Marine's recreational sales operation to San Dimas and San Fernando on March 1, 1977. Although union workers were terminated, Mission announced its intention to contribute to the union trust fund and take applications for employment at its new locations. The union replied that the relocation, motivated by an attempt to avoid the CBA, would constitute an unfair labor practice.
 
 
 10
 On the same day, Mission activated Cal Marine, the inactive corporate shell, to conduct the relocated recreational sales operations of LA Marine. Cal Marine employees have the same job classifications and performed the same type of work as did the LA Marine employees in recreational sales prior to the relocation. The wages and benefits at the new warehouses, however, are approximately $3 per hour less than those agreed upon in the CBA between LA Marine and the union.
 
 
 11
 LA Marine ceased its operations in San Pedro and transferred its equipment and supplies to Cal Marine's San Dimas and San Fernando locations in April 1977. The new locations are 50 to 60 miles from San Pedro.
 
 DISCUSSION
 
 12
 Our review of the Board's findings is limited. If they are supported by substantial evidence on the record as a whole and if the Board applied the law correctly, the order will be enforced. 29 U.S.C. § 160(e) (1976). See, e. g., NLRB v. Heath Tec Division, 566 F.2d 1367, 1369 (9th Cir. 1978).
 
 Single Employer :
 
 13
 The Board's findings of unfair labor practices turn initially upon their determination that LA Marine and Cal Marine constitute a single employing enterprise under § 2(2) of the Act. See, NLRB v. Triumph Curing Center, 571 F.2d 462, 467 (9th Cir. 1978). The determination is essentially factual and must stand unless clearly erroneous. NLRB v. Sweet Lumber Company, 515 F.2d 785, 793 (10th Cir.), Cert. denied, 423 U.S. 986, 96 S.Ct. 393, 46 L.Ed.2d 302 (1975).
 
 
 14
 The four criteria for determining the existence of an integrated enterprise are: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control. Radio Union v. Broadcast Service, 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965). The first three factors carry the most weight and particularly significant is the common control of labor. Triumph Curing Center, 571 F.2d at 468.
 
 
 15
 Here, each of the Radio Union criteria is satisfied. The operations of the two companies are interrelated. A central office handles the payroll and preparation of all financial statements for both and Cal Marine continues to do business with LA Marine's old customers.
 
 
 16
 There is common management. Mission made the decision to transfer LA Marine's recreational sales operations to Cal Marine and Mission sets the annual profit targets for both. Zajic, a vice-president of Mission, is the head of the Hardware Distribution Group which includes both LA Marine and Cal Marine. Finally, the authority of the division managers with respect to personnel matters is the same as before the relocation.
 
 
 17
 Most importantly, Mission exercises common control over the labor relations policies of both divisions. Zajic was solely responsible for the pre- and post-relocation negotiations with the Union. Finally, Mission is the common owner of LA Marine and Cal Marine.
 
 
 18
 There is substantial evidence on the record as a whole to support the conclusion that Cal Marine is merely continuing LA Marine's recreational sales operation under a different name. As a result, LA Marine and Cal Marine are a single employing enterprise under § 2(2) of the Act.[3]Unfair Labor Practices :
 
 
 19
 Mission relocated LA Marine's recreational sales operation because of its dissatisfaction with labor costs imposed by the CBA. Its motivation was strictly economic and was not based upon unlawful considerations. The inquiry, however, does not stop here.
 
 
 20
 The employers were bound to a collective bargaining agreement which was not scheduled to expire until 1979. The agreement covered the union's recreational sales employees. This is different from most relocation cases in that the relocation here took place during the effective period of the agreement. The Board's findings are predicated upon this mid-term repudiation.
 
 
 21
 After negotiations failed, the employers moved the San Pedro bargaining unit work to San Dimas and San Fernando without the union's consent. In conjunction with the relocation, it instituted less favorable wages at the new locations and abandoned the then existing CBA as to the recreational sales operation. This was done despite the fact that Mission, LA Marine and Cal Marine are a single employing enterprise.
 
 
 22
 The Board found, in part, that LA Marine and Cal Marine violated §§ 8(d), 8(a) (3) and (5) of the Act by: (1) discharging and refusing to reinstate LA Marine employees; (2) closing the San Pedro facility and relocating the recreational sales operation in an attempt to withdraw work from the bargaining unit; (3) refusing to apply the terms and conditions of the CBA to the new Cal Marine employees; (4) withdrawing recognition of the union as the collective bargaining representative of those employees, and (5) modifying unlawfully the CBA, in mid-term, without the consent of the union. Its findings were correct.
 
 
 23
 The employers argue that they neither repudiated nor modified the CBA in mid-term because the agreement applies to the San Pedro area only. This is their primary defense to the unfair labor violations. They rely upon language in the CBA preamble which states:
 
 
 24
 THIS MASTER AGREEMENT is made and entered into by and between CHAUFFEURS, SALES DRIVERS, WAREHOUSEMEN AND HELPERS UNION LOCAL 572, IBT, hereinafter referred to as the "Union," and C. J. HENDRY COMPANY, MARINE HARDWARE COMPANY AND SEASIDE SUPPLY STORES, INC., On behalf of their operations located at San Pedro, California and vicinity, . . . . (emphasis added).
 
 
 25
 The employers contend that this is a clear waiver by the union and limits the geographical application of the agreement.[4] See Oddie v. Ross Gear and Tool Co., 305 F.2d 143 (6th Cir.), Cert. denied, 371 U.S. 941, 83 S.Ct. 318, 9 L.Ed.2d 275 (1962); Timken Roller Bearing Co. v. NLRB, 325 F.2d 746, 750-51 (6th Cir. 1963), Cert. denied, 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed.2d 85 (1964). They argue that if their construction of the preamble is correct, they did not commit any unfair labor practices.
 
 
 26
 The language cited is not a geographical limitation, but merely the parties' descriptive recitation of the physical location of the facilities at the time of the negotiations. The language appears only in the preamble of the agreement, and not in the recognition clause. The agreement's effectiveness is not limited expressly to the San Pedro area, nor is there evidence that the parties intended such a limitation.
 
 
 27
 An employer cannot alter mandatory contractual terms during the effective period of the agreement without the consent of the union. Chemical Workers v. Pittsburg Glass, 404 U.S. 157, 159, 183-88, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). As a result, the employers' actions here amounted to a mid-term repudiation of the CBA, in violation of §§ 8(d) and 8(a)(1) and (5) of the Act. Oak Cliff-Golman Baking Co., 207 N.L.R.B. No. 138 (1973), Enfd. 505 F.2d 1302 (5th Cir. 1974), Cert. denied, 423 U.S. 826, 96 S.Ct. 42, 46 L.Ed.2d 43 (1975).
 
 
 28
 Such a repudiation is not excused because the employer acted in good faith or was motivated solely by economic necessity. Oak Cliff-Golman Baking Co., supra. Nor is an employer relieved of its duty to recognize the union by relocating its business, when the relocation is an unfair labor practice. To permit such a result would allow an employer to do indirectly what cannot be done directly under the Act. See generally, Triumph Curing Center, 571 F.2d at 474.
 
 
 29
 The Board properly found that the employer violated Sections 8(d), 8(a)(1) and (5) of the Act.[5]
 
 
 30
 The Board found also a violation of §§ 8(a)(1) and (3) of the Act because the employers terminated 23 LA Marine recreational sales employees as a direct result of their attempt to abandon the CBA.
 
 
 31
 A § 8(a)(3) violation requires normally that the Board make an affirmative showing that the employer's discriminatory conduct was motivated by an antiunion purpose. NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 33, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); Portland Willamette Co., Inc. v. NLRB, 534 F.2d 1331, 1334 (9th Cir. 1976). When the employer's conduct is "inherently destructive," however, antiunion motivation is presumed to exist. Great Dane, 388 U.S. at 33-34, 87 S.Ct. 1792; Western Exterminator Co. v. NLRB, 565 F.2d 1114, 1118 n.3 (9th Cir. 1977). See also NLRB v. Tahoe Nugget, Inc., 584 F.2d 293, 300 n.24 (9th Cir. 1978); Triumph Curing Center, 571 F.2d at 474; Kaiser Engineers v. NLRB, 538 F.2d 1379, 1386 (9th Cir. 1976); Portland Willamette, 534 F.2d at 1334; Signal Oil & Gas Co. v. NLRB, 390 F.2d 338, 343 (9th Cir. 1968). The Board concluded that the termination and refusal to reinstate these employees was "inherently destructive" of employee rights. See Rushton and Mercier Woodworking Co., Inc., 203 N.L.R.B. No. 17 (1973) (Enf'd by unpub. opinion, 1st Cir. March 21, No. 73-1289). We agree.
 
 
 32
 Because the conduct here is "inherently destructive,"
 
 
 33
 the employer has the burden of explaining away, justifying or characterizing "his actions as something different than they appear on their face," and if he fails, "an unfair labor practice charge is made out." (NLRB v. Erie Resistor Corp., 373 U.S. 221, 228, 83 S.Ct. 1139, 1145, 10 L.Ed.2d 308 (1963)). And even if the employer does come forward with counter explanations for his conduct in this situation, the Board may nevertheless draw an inference of improper motive from the conduct itself and exercise its duty to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy. Id., at 229 (83 S.Ct., at 1145).
 
 
 34
 Great Dane, 388 U.S. at 33-34, 87 S.Ct. at 1797.
 
 
 35
 The employers did not carry the burden of justifying their actions. On balance, the employers' desire to escape the financial burden they contracted for voluntarily is not an adequate business justification that would excuse the unlawful terminations. See generally, NLRB v. Nash-Finch Co.,211 F.2d 622, 626 (8th Cir. 1954).
 
 
 36
 Finally, the employers argue that even if they violated § 8(a)(3) of the Act, eight of the terminated employees were not discriminatees. The employers contend that Gondolfi, Castignolia, Newel, Donatoni, Davi and Williamson could have used their seniority to obtain positions at the reorganized LA Marine,[6] and Isaacs and Amos would have been terminated in any event.[7]
 
 
 37
 These arguments are without merit with respect to seven of the eight employees. There is substantial evidence on the record as a whole to support the Board's findings that the employer repudiated the CBA. There is no evidence that these employees would have retired or been fired had the employers not violated the Act. Consequently, these persons are discriminatees and are entitled to reinstatement.[8]
 
 
 38
 We do not take a position as to Newell because the matter was not reached below. The Board decided that the question whether he could have continued work, but for the unfair labor violations, was better left for determination during the compliance stage of the proceedings.
 
 Deferral to Arbitration :
 
 39
 The employers requested that the Board defer to arbitration the question whether the language in the agreement's preamble was a descriptive recitation or a geographic limitation. The Board correctly denied this request.
 
 
 40
 We note the long recognized national labor policy favoring arbitration. NLRB v. Acme Industrial Co., 385 U.S. 432, 439, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967). The policy has much less force, however, in this procedural context.
 
 
 41
 The employer has not sued to compel the union to submit to arbitration. Such actions are cognizable under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a), which gives federal district courts jurisdiction over suits to enforce collective bargaining agreements. See Lodge 1327, Int. Ass'n of Mach. & A. W. v. Fraser and Johnston Co., 454 F.2d 88 (9th Cir. 1971).
 
 
 42
 Here, the Board brought an enforcement proceeding against the employer under § 10 of the Act. Section 10(a) of the Act gives the Board power to prevent unfair labor practices, unaffected by any other means agreed to by the parties. 29 U.S.C. § 160(a). The Board can exercise its jurisdiction without regard to potential or pending arbitration proceedings. Carey v. Westinghouse Electric Company, 375 U.S. 261, 272, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964); NLRB v. Columbus Printing Pressmen, etc., 543 F.2d 1161, 1167 (5th Cir. 1976).
 
 
 43
 Although the Board May defer the exercise of its authority to contractually establish arbitral processes, it is not compelled to do so.[9] Acme Industrial Co., 385 U.S. at 436-437, 87 S.Ct. 565. Here, the Board decided that deferral would not further the policies of the Act in light of the allegations that the employer repudiated the collective bargaining relationship.
 
 
 44
 The Board did not abuse its discretion. As stated by the Supreme Court, "the Board may proscribe conduct which is an unfair labor practice even though it is also a breach of contract remediable as such by arbitration and in the courts." NLRB v. Strong, 393 U.S. 357, 361, 89 S.Ct. 541, 544-545, 21 L.Ed.2d 546 (1969), citing Smith v. Evening News Assn., 371 U.S. 195, 197-198, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). See also, Morrison-Knudsen v. NLRB, 418 F.2d 203, 204 (9th Cir. 1969).[10]
 
 
 45
 We grant enforcement of the Board's order.
 
 
 
 *
 Of the District of Kansas
 
 
 [1]
 Referred to as employers
 
 
 [2]
 Chauffeurs, Sales Drivers, Warehousemen and Helpers Union, Local 572, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America
 
 
 [3]
 The employer argues that the Board erred in not applying the accretion principle. This argument is without merit because an accretion requires the addition of new employees to an already existing unit. Here, there was a transfer of the recreational sales operation. NLRB v. Sunset House, 415 F.2d 545, 547 (9th Cir. 1969). In addition, the Board's discretion in applying this principle is broad. NLRB v. Hospital and Institutional Workers, etc., 577 F.2d 649, 653 (9th Cir. 1978)
 
 
 [4]
 The employers argue that the bargaining conduct of the union, prior to the relocation, supports the position that the CBA was subject to a geographical limitation. We disagree. Contrary to the employers' assertions, the union refused to agree to a mid-term modification of the contract, and did, in fact, notify Mission that it viewed the relocation as an illegal attempt to avoid the contract. Nor does the union's failure to assert the applicability of the LA Marine agreement to other LA Marine locations support the employers' claim that the CBA was limited by its terms to the San Pedro area
 
 
 [5]
 As a result, we do not reach the Board's argument that even if the CBA contains a geographical limitation, the relocation still constituted an unfair labor practice
 
 
 [6]
 There is no indication in the record to support the conclusion that any of these employees, with the exception of Newell, would have retired had the company not violated the Act. Although the record does indicate that Gondolfi, Newell and Castignolia had sufficient seniority to remain employed by LA Marine, this alone does not undermine the Board's findings. Their decision to retire was tainted by the employers' unfair labor practices
 The record indicates only that Davis was high on the seniority list and that Williamson had sufficient years of service to retire. It does not indicate that they were entitled by seniority to a position at LA Marine.
 Finally, there is conflicting testimony, at best, regarding whether Donatoni was offered an opportunity to transfer and we adopt the Board's position.
 
 
 [7]
 The record does indicate that Isaacs and Amos had problems with their work records and that Isaacs' employment application to Cal Marine was denied because he was an unsatisfactory employee. They were retained during the relocation, however, along with many of the other LA Marine employees. The fact that they had problems with their work records is not alone a sufficient defense to their termination because, here, the termination was part of the employer's attempt to repudiate the CBA
 
 
 [8]
 We approve the make-whole remedies ordered by the Board. See Great Chinese Am. Sewing Co. v. NLRB, 578 F.2d 251, 255 (9th Cir. 1978)
 
 
 [9]
 The employers concede that the decision to defer to arbitration is discretionary but cites Stephenson v. NLRB, 550 F.2d 535, 539 (9th Cir. 1977), for the proposition that the decision is not immune from judicial scrutiny. Their reliance on this case is misplaced. In Stephenson, the court held that deferral was inappropriate because the arbitration panel did not clearly decide the issues to which the Board was asked to give deference
 
 
 [10]
 It would serve no purpose now to defer this dispute to arbitration. If the arbitrator's construction of the contract is consistent with the Board's finding of NLRA violations, nothing is changed. If the arbitrator decides differently, the Board can reject the arbitrator decision if it is repugnant to the purposes and policies of the Act. Hawaiian Hauling Service, Ltd. v. NLRB, 545 F.2d 674, 675 (9th Cir. 1976). The Board did not abuse its wide discretion in refusing to defer to arbitration